ABKCO MUSIC, INC., Plaintiff,

v.

WESTMINSTER MUSIC, LTD., Defendant.

No. 91 Civ. 2155 (LBS).

United States District Court, S.D. New York.

Dec. 2, 1993.

Pryor, Cashman, Sherman & Flynn, New York City (Donald S. Zakarin, Paige Moore, of counsel), for plaintiff.

Abeles Clark Osterberg and Prager, New York City (Robert C. Osterberg, Stuart Prager, of counsel), for defendant.

## OPINION

SAND, District Judge.

By oral opinion delivered November 29, 1993, we denied plaintiff's request for a jury instruction on the law regarding a licensee's exploitation of a publishing license through newly developed technologies that were not in existence at the time the licensing contract was written. We write now to clarify our reasoning on this significant issue, as to which the law in the Second Circuit is unsettled.

The issue arose at trial of a dispute between two music publishing companies over the scope of subpublishing rights granted in 1966 in certain songs by the Rolling Stones (the "Songs"). The parties dispute the scope of rights conveyed by the predecessor-in-interest of plaintiff ABKCO Music, Inc. ("ABKCO"), the copyright holder, to the predecessor-in-interest of defendant Westminster Music, Ltd. ("Westminster") in the 1966 subpublishing contract (the "Contract"). The Contract, as subsequently modified, conveyed to Westminster "all rights" in the Songs, "including but not limited to" certain more limited rights, within a territory encompassing the entire world with the exception of the United States and Canada (the "Territory"). Nothing in the Contract refers in any way to rights in technologies yet to be developed, and the parties did not discuss the issue during negotiations. Among the issues disputed by the parties is whether, under New York law, the "all rights" language conveyed to Westminster the right to issue licenses for the Songs on videocassettes and other media that were not in existence when the Contract was signed in 1966.

ABKCO requested a charge instructing the jury as follows:

> With respect to videocassettes, the parties are in agreement that the technology and market for home use videocassettes did not exist in 1966 and did not come into existence until the early 1970s, years after the contract was negotiated and signed. **You must therefore consider whether you believe that the parties intended to include within the grant of rights to Westminster, no matter what you may decide the scope of that grant of rights to be, uses of the compositions that they did not discuss and which did not exist. As a rule, to assist you in making your determination, I will charge you that, absent knowledge of a technology or absent language in an agreement indicating an intent to grant rights of exploitation that both exist now as well as means of exploitation that do not presently exist but might come into existence in the future, the law presumes that there was no intent to grant such rights.**

Plaintiff's Requested Instruction No. 16 (emphasis added).

In a charging conference with the parties on November 29, 1993, we denied that part of the requested charge that we have highlighted above. We charged the jury instead as follows:

> You must therefore consider what you think was the parties' intention regarding technologies not yet in existence. Did the parties intend to include within the grant of rights to Westminster potential uses of the Songs in media that did not yet exist? Or did they intend to restrict the grant of rights to technologies already in existence? This is an issue for you the jury to decide, in light of the language of the Contract, the statements of witnesses, and all the other evidence that has been presented in this trial, guided by the instructions I have

given you on how to interpret the Contract.

## DISCUSSION

The Second Circuit has not squarely addressed the issue of licensing rights in new technologies, and the law elsewhere on this issue is equally unsettled. *See* Melville B. Nimmer & David Nimmer, 3 *Nimmer on Copyright* § 10.10[B] (1992) (*"Nimmer"*). *Nimmer* identifies "two possible approaches"—1) the preferred, broad-construction approach, allowing the licensee to "pursue any uses which may reasonably be said to fall within the medium as described in the license"; and 2) the less favored, strict-construction approach, granting the licensee only such uses as fall within the "unambiguous core meaning" of the term. *Id.* at 10–85 to 10–86. By asking us to instruct the jury that "the law presumes that there was no intent to grant such rights [in not-yet-developed technologies]," ABKCO has in effect asked us to choose the second, strict-construction approach. For the reasons set out below, we have instead chosen the first approach, favoring a less restrictive construction of ABKCO's intent as licensor.

To support its position that New York has in effect chosen the second approach, ABKCO relies primarily on a recent case in the Southern District of New York, *Bourne Co. v. Walt Disney Co.*, No. 91 Civ. 344 (LLS), 1992 WL 170686 1992 U.S.Dist. LEXIS 9853 (S.D.N.Y. July 1, 1992), *rev'd on other grounds, Bourne Co. v. Tower Records, Inc.*, 976 F.2d 99 (2d Cir.1992).[1] In this case, plaintiff, the successor-in-interest to Irving Berlin Inc., moved to preliminarily enjoin videocassette uses by Disney of songs in which Disney had acquired a license-back. The license-back, which was issued in or about 1939, gave Disney the right to record the songs "in synchronism with any and all of the motion pictures which may be made by you ... and the right to give public performances of such recordings." *Id.* at *1. In granting the injunction, Judge Stanton held that the videocassette uses did not fall within

the scope of the contract, since "[u]nder New York law, if the disputed use was not invented when the parties signed their agreement, that use is not permitted under the contract." *Id.* at *6.

The *Bourne* ruling hinges on a 1933 case in the New York Court of Appeals, *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 85, 188 N.E. 163, and, we think, reads the holding of that case too broadly. In *La Shelle*, the New York Court of Appeals examined whether a 1921 settlement agreement which conveyed rights in stage productions of a play also conveyed rights in sound motion pictures of the play. The court concluded that "[s]ince 'talkies' were unknown at the time when the contract was entered into, it cannot be said that 'talkie' rights were within the contemplation of the parties." 263 N.Y. at 85, 188 N.E. 163.

This conclusion in *La Shelle* states a far narrower proposition than the broad rule which *Bourne* stated, a proposition which, furthermore, must be read in the context of the facts of that case. A broader examination of the case law and the factors involved was conducted recently by the First Circuit, in a case which provides the fullest available discussion of this issue. *See Rey v. Lafferty*, 990 F.2d 1379, 1387–91 (1st Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 94, 126 L.Ed.2d 61 (1993).

As the court noted in *Rey*, a court's first step in addressing contracts of this sort should be "to identify any indicia of a mutual *general* intent to apportion rights to 'new uses,' insofar as such general intent can be discerned from the language of the license, the surrounding circumstances, and trade usage." 990 F.2d at 1387. This approach has been employed in cases in this circuit. *See Rooney v. Columbia Pictures Ind's*, 538 F.Supp. 211, 226–28 (S.D.N.Y.), *aff'd without opinion,* 714 F.2d 117 (2d Cir.1982), *cert. denied,* 460 U.S. 1084, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983) (holding that expansive language in series of contracts granting general license to exhibit films encompassed right to distribute films by means of later-

---

1. ABKCO also cites several other less persuasive authorities, the most relevant of which are discussed *infra*.

developed video technology); *Filmvideo Releasing Corp. v. Hastings,* 446 F.Supp. 725 (S.D.N.Y.1978) (holding that the author's explicit retention of "all" television rights to licensed books, in 1935 grant of motion picture rights, included retention of rights in the not-yet-developed capability to show motion pictures on television).

Where such general intent cannot be discerned from the language of the contract, or from the surrounding circumstances and trade usage, courts have resorted, as the First Circuit notes, to either of the two approaches canvassed by *Nimmer. See Rey,* 990 F.2d at 1387–88. In such cases, as *Nimmer* and *Rey* note:

> [t]he very fact that we are most often dealing with a later developed technological process ... suggests that the parties' ambiguous phraseology masks an absence of intent rather than a hidden intent which the court simply must "find."

*Nimmer* § 10.10[B] at 10–85 (quoted in *Rey,* 990 F.2d at 1387). Given an absence of intent by the parties, it does not automatically follow, as a mechanical application of the *La Shelle* language would have it, that future uses should necessarily be precluded. Rather, the allocation of the risks and rewards of unforeseen "new uses" to one party or another becomes an issue of policy which it is the responsibility of the courts to decide. The question becomes: In the context of the particular agreement, which party should properly " 'reap the ... windfall' associated with the new medium"? *Cohen v. Paramount Pictures Corp.,* 845 F.2d 851, 854 (9th Cir. 1988).

*Rey* places into this context the few cases in the Second Circuit and New York that address this topic. *See* 990 F.2d at 1388. *Rey* cites *Bourne* and *La Shelle* as examples of the less-preferred strict-construction approach, and one Second Circuit case, *Bartsch v. Metro–Goldwyn–Mayer, Inc.,* 391 F.2d 150, 155 (2d Cir.1968) (Friendly, J.), *cert. denied,* 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968), as an example of the "preferred" approach.

In *Bartsch,* Judge Friendly, adopting *Nimmer* 's broad-construction approach, held that a 1930 contract which granted motion picture licensing rights included the right to exhibit the motion picture by telecast. He cited *Nimmer* to the effect that "the licensee may properly pursue any uses which may reasonably be said to fall within the medium as described in the license." 391 F.2d at 155; *followed in Landon v. Twentieth Century– Fox Film Corp.,* 384 F.Supp. 450, 454–55 (S.D.N.Y.1974). However, Judge Friendly distinguished the case from *La Shelle,* "in which the new medium was completely unknown at the time when the contract was written." 391 F.2d at 154.

In *Bourne,* the Court seized on Judge Friendly's words distinguishing *Bartsch* from *La Shelle,* and concluded that "[u]nder New York law, if the disputed use was not invented when the parties signed their agreement, that use is not permitted under the contract." 1992 WL 170686 at *6. We find a more finely tuned statement of the law, and a more appropriate, narrower reading of *La Shelle,* in *Bartsch* and *Rey.* As Judge Friendly wrote of *La Shelle:*

> While *Kirke La Shelle* teaches that New York will not charge a grantor with the duty of expressly saving television rights when he could not know of the invention's existence, we have found no case holding that an experienced businessman like Bartsch is not bound by the natural implications of the language he accepted when he had reason to know of the new medium's potential.

391 F.2d at 154. This reading, confining the language of *La Shelle* to its context, is in accord with the First Circuit's reading of *La Shelle.* In *Rey,* the First Circuit concluded that the narrow-construction approach

> may ... be appropriate where a particular "new use" was completely unforeseeable and therefore *could not possibly* have formed part of the bargain between the parties at the time of the original grant. Obviously, this method may be less appropriate in arm's-length transactions between sophisticated parties involving foreseeable technological developments; in such situations, narrow construction license grants may afford an unjustifiable windfall to the licensor, who would retain blanket rights to analogous "new uses" of

copyright material notwithstanding the breadth of the bargained-for grant.

990 F.2d at 1388 (citations omitted).

We agree with this reasoning and conclude that the narrow "rule" of *La Shelle* is appropriate only in cases in which the parties "could not know of the invention's existence," *Bartsch,* 391 F.2d at 154, and in which, in addition, the possibility of such not-yet-developed uses "could not possibly have formed part of the bargain between the parties," *Rey,* 990 F.2d at 1388.

In this case, the parties, ABKCO and Westminster, are obviously sophisticated music publishing companies who have issued hundreds if not thousands of music licenses and who were fully conversant at the time of the Contract with the pace of technological change in the music business. In addition, the Contract, as opposed to the contract at issue in *Bourne,* does contain a grant, however disputed, of "all rights" in the Songs. When a party conveys a grant of this breadth, we cannot simply conclude, as the Court of Appeals did in *La Shelle,* 263 N.Y. at 85, 188 N.E. 163 that "[s]ince [the new uses] were unknown at the time when the contract was entered into, it cannot be said that [they] were within the contemplation of the parties." Instead, ABKCO should be "bound," as Judge Friendly noted, "by the natural implications of the language [it] accepted." 391 F.2d at 155. What those implications are, we think, is a question for the finder of fact to decide.

Accordingly, for the reasons stated, ABKCO's request to charge was denied.