Douglas A. JOHNSON, d/b/a Douglas A. Johnson & Associates, and Professional Management Co., Plaintiffs,

v.

Theresa C. JONES, Daniel A. Tosch, Progressive Associates, Inc., John C. Uznis and Uznis Deneweth Co., Individually, Jointly and Severally, Defendants.

No. 94–CV–70497–DT.

United States District Court, E.D. Michigan, Southern Division.

April 20, 1995.

Bernard J. Cantor and Douglas P. Lalone, Harness, Dickey & Pierce, Troy, MI, for plaintiffs.

Carl F. Jarboe, Detroit, MI, William H. Honaker, Bloomfield Hills, MI, for T.C. Jones, J.C. Uznis and Uznis Deneweth Co.

Richard P. Smith, Detroit, MI, for D.A. Tosch and Progressive Associates, Inc., for defendant.

*OPINION AND ORDER REGARDING DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT*

ROSEN, District Judge.

## I. INTRODUCTION

On February 10, 1994, Plaintiffs Douglas A. Johnson (d/b/a Douglas A. Johnston & Associates), and his construction firm Professional Management Co. filed a four-count complaint against Defendants Theresa C. Jones, Daniel A. Tosch, Tosch's architectural firm (Progressive Associates, Inc.), John C. Uznis and Uznis' construction firm (Uznis Deneweth Co.). An amended complaint was entered by order of the Court on October 26, 1994. Count I of Plaintiffs' amended complaint alleges that Defendants infringed Plaintiff Douglas Johnson's copyright to certain technical architectural drawings he prepared for renovation of Defendant Theresa Jones' home. The drawings, for which Johnson holds a certificate of copyright registration, consist of three pages of general floor plan and design layout for the home, as well as two larger and more detailed works, entitled "Demolition Phase I" and "Addition A." Count II alleges that Defendants infringed Johnson's copyright to a design proposal package entitled "Jones Residence Architectural Proposal Package," for which he also holds a certificate of copyright registration. Count III alleges breach of contract.[1] And, Count IV alleges trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1125.

Defendants Theresa C. Jones, John C. Uznis and Uznis Deneweth Co. filed two motions for partial summary judgment on October 31, 1994. The first seeks summary judgment on Counts I and II of Plaintiffs' amended complaint; the second seeks summary judgment on Count IV. Defendants Daniel A. Tosch and Progressive Associates, Inc., filed a concurrence to both motions on that same day. Plaintiffs responded to the motions on December 5, and Defendants replied on December 22. After reviewing the papers filed by the parties and the arguments made by their counsel at a hearing held on March 31, 1995, the Court is now prepared to rule on Defendants' motions. This memorandum opinion and order sets forth that ruling.

## II. FACTUAL BACKGROUND

Presented in the light most favorable to the Plaintiffs, the evidence before the Court, consisting primarily of Plaintiff Johnson's deposition testimony, reveals the following. In July of 1993, Johnson, who is an architect, first met with Defendant Theresa C. Jones to discuss the possibility of renovating a home Jones was considering purchasing at 1100 Orchard Ridge Road, Bloomfield Hills, Michigan. Jones' real estate agent had suggested the meeting. Later that month, Jones arranged to purchase the home, and verbally agreed with Johnson to use his services to redesign the home for a fee of 3.5% of construction costs, which were expected to exceed one million dollars. The parties did not discuss construction management at that time.

Subsequently, Johnson prepared a design proposal ("Jones Residence Architectural Proposal Package"—the subject of Count II of Plaintiff's amended complaint), and submitted it to Jones for approval on or about July 25, 1993, with a proposed written contract for architectural services. At the July 25th meeting, the two agreed that Johnson should also manage construction of the renovation for a fee of 14% of construction costs. Thereafter, the parties began to negotiate the terms of a written "design/build" contract.

At deposition, Johnson was questioned about the implications of his failure to discuss construction management at the initial meeting during which Jones' agreed to use Johnson's architectural services:

---

1. The exact nature of this count is unclear. In addition to breach of contract, Plaintiffs appear to rely on detrimental reliance as a grounds for recovery of damages.

Q: And did she say yes, I want you to do the architectural work?

A: Yes, right.

Q: It's your contention you had an oral agreement at that point?

A: We had an oral agreement at that point.

Q: Okay. And that would be that you would get 3½ percent and you would do the plans?

A: Yes.

Q: And were you to build the house as well?

A: Not at that time.

Q: No?

A: We hadn't discussed it at that meeting.

Q: All right. So under this particular agreement that you believe you had, she would hire you to do the architectural plans and then she could hire someone else to build the house?

A: No. That wasn't discussed either.

At that time I was hired to do the design work at 3½ percent.

Q: All right.

A: At that time.

Q: What was your understanding of this oral agreement that you believe you had? If she paid you 3½ percent for those plans would she be required to use you to construct the building or could she use someone else to construct the building?

A: At that time she could have used someone else.

(Deposition of Douglas A. Johnson, Brief in Support of Defendants' Motion for Summary Judgment on Counts I and II, Exhibit 1, pp. 72–73).

At the July 25, 1993, meeting Johnson submitted a proposed contract to Jones with the following clause (emphasis added):

The Drawings, Specifications and other documents prepared by the Architect for this Project are instruments of the Architect's service for use solely with respect to this Project, and the Architect shall be deemed the author of these documents and shall retain all common law, statutory and other reserved rights, including the copyright.... *The Architect's Drawings, Specifications and other documents shall not be used by the Owner or others* on other projects, for additions to this Project or *for completion of this Project by others, unless the architect is adjudged to be in default under this Agreement, except by agreement in writing and with appropriate compensation to the Architect.*

(This is part of a standard form contract prepared by the American Institute of Architects, Form No. B151, entitled "Abbreviated Form Agreement Between Owner and Architect.") Similar language appears in a proposed contract for design and construction work that Johnson submitted to Jones after she asked him to manage construction of the project. Furthermore, throughout contract negotiations, Johnson objected to language in contracts proposed by Jones' attorney that would have vested ownership of the plans in Jones.[2]

During contract negotiations, both parties began performance. Johnson gathered construction estimates, prepared a general demolition and construction plan as well as cost estimates, completed a first draft and revision of preliminary design drawings for the upper and lower levels and foundation of the home, and prepared detailed architectural construction documents for the first of several proposed phased-in additions. Johnson also prepared a site plan which he submitted to the City of Bloomfield Hills, along with Demolition Phase I and Addition A plans, in order to obtain a construction permit for Jones. Jones apparently approved of the plans, and made payments to Johnson totalling $10,000 (a $5,000 retainer plus an additional $5,000).

---

**2.** In their Reply Brief, Defendants point to one instance in which Johnson failed to object to a proposed contract clause that would have allowed Jones to retain a copy of all the architectural drawings to be used by her for "any purpose." Johnson explains in his deposition that his attorney's failure to object to that clause was an oversight. Johnson objected to similar clauses in other proposed contracts.

After a series of contract proposals, Jones' attorney informed Johnson's attorney by letter dated November 12, 1993, that Johnson's services would no longer be needed. Johnson submitted a final invoice for "Fees Earned To Date" to Jones shortly thereafter.[3] The invoice seeks an additional $19,-966.98 from Jones for partial completion of the architectural plans. (It does not seek any compensation for construction management services.) To date, Jones has not paid Johnson any amount beyond the initial $10,-000. Johnson did not seek return of copies of architectural drawings he had given to Jones. However, he did retrieve an artist's rendering of his proposal for which Jones had declined to pay.

After Johnson's termination, Jones contracted with her co-defendants, architect Daniel A. Tosch and his firm Progressive Associates, Inc., and John C. Uznis and his construction firm Uznis Deneweth Co., to complete the renovation project. According to Plaintiffs, Defendants continued to use and copy architectural plans prepared by Johnson for the renovation, both in their original form and as a base for derivative works. Furthermore, Plaintiffs allege that Defendants Tosch and Progressive Associates cut Plaintiffs' name and seal off drawings which he had submitted to the City of Bloomfield Hills, and replaced them with their own names and seal before re-submitting them to the City.

### III. *ANALYSIS*

#### A. *THE STANDARDS GOVERNING CONSIDERATION OF A MOTION FOR SUMMARY JUDGMENT.*

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court decisions— *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[4] According to the *Celotex* Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment:

[*] Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

[*] The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

[*] This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case. * * *

[*] The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly

---

**3.** This document was improperly dated September 12, 1993. (*See* Defendants' Motion for Summary Judgment on Counts I and II, Exhibit 2). Johnson testified that this date is incorrect, and that the document actually was prepared on November 12, 1993. (Johnson Deposition, p. 197).

**4.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright et al., *Federal Practice & Procedure* § 2727, at 35 (Supp.1994).

supported motion for summary judgment."

[*] The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

[*] The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

See Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479–80 (6th Cir.1989) (footnotes with citations omitted). The Court will apply the above principles in deciding Defendants' motion for summary judgment.

## B. MATERIAL ISSUES OF FACT REMAIN ON WHETHER DEFENDANTS INFRINGED PLAINTIFF'S COPYRIGHTS.

### 1. The Parties' Arguments.

Defendants do not affirm or deny that Plaintiff Johnson retains valid copyrights to the architectural works in dispute[5], nor do they deny that their use of the works implicated those rights. Rather, they avoid these issues by arguing that Jones obtained an implied nonexclusive copyright license to use the architectural plans and technical drawings solely for the purpose of completing the renovations to her home, and that Defendants' use of the documents did not exceed that license.

Defendants rely on an alleged oral contract that was formed when Johnson agreed to complete the plans for 3½% of construction costs. They argue that at that point in time Johnson expressly agreed to prepare the plans, and implicitly agreed to grant Jones a license. They rely on the following facts in support their contention: Johnson's admission that Jones could have used another contractor for supervision of construction; Johnson's submission of a "final" invoice for services rendered after his termination; and Johnson's failure to secure return of copies of the architectural drawings he had given to Jones. According to Defendants, "If the total amount of the invoice had been paid, then there presumably could be no argument that Mrs. Jones could not use the drawings to remodel her house. Since there is a dispute as to the amount owed, it is clear that this is a simple contract case. The only issue should be 'how much should be paid for the drawings.'" (Brief in Support of Defendants' Motion for Summary Judgment on Counts I an II, p. 3).

■ Plaintiffs apparently agree that a contract was formed[6], but deny that a nonexclusive license was part of it.[7] They argue that all of the circumstances surrounding the interactions between the parties should be con-

---

**5.** Section 102(a)(8) of the Copyright Act, 17 U.S.C. § 102(a)(8), specifically notes that "architectural works" are protectable. "An 'architectural work' is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features." 17 U.S.C. § 101.

**6.** Plaintiffs do not necessarily agree that a contract was formed at the first meeting, as Defendants seem to insist. Given that Count III of Plaintiffs' amended complaint alleges breach of contract, however, they apparently believe a contract was formed at some point during negotiations. Although copyright transfers are often made by contract, they need not be. An assign-

ment or exclusive license of copyrights is treated like a conveyance of property, which may be achieved by gift or sale. Absent consideration, however, nonexclusive licenses are revocable. See M. Nimmer & D. Nimmer, 3 Nimmer on Copyright § 10.02[B][5], at 10–25 (1994).

**7.** This argument appears to go too far. If Johnson had completed the architectural portion of the project, been paid in full, and Jones had used a different construction contractor, surely Johnson would not have objected to use of the plans by Jones and her contractor to actually build the project. Indeed, he admitted as much in his deposition testimony. Essentially, Plaintiffs argue that conditions precedent to transfer of a license were not satisfied, and thus no transfer occurred.

sidered. They note that the contract proposal submitted to Jones on or about July 25, 1993, included an express reservation of rights: "The Architect's Drawings, Specifications and other documents shall not be used by the Owner or others on other projects, for additions to this Project or for completion of this Project by others, unless the architect is adjudged to be in default under this Agreement, except by agreement in writing and with appropriate compensation to the Architect." Similar reservations were contained in subsequent proposed contracts.

In the alternative, Plaintiffs argue that even if a license to use the plans had been granted, the license could not be interpreted to include the right to prepare derivative works.[8] Finally, Plaintiffs rely on Michigan's Statute of Frauds to void any contract that might have been formed.

In reply, Defendants argue that the negotiations surrounding the design/build contract, on which they claim Plaintiffs rely, are irrelevant. According to them, a contract was formed at the meeting in which Johnson agreed to provide architectural services in exchange for 3½% of construction costs. Furthermore, Defendants argue that their derivative use of Johnson's work, if any, was within the scope of the license: "Included within the implied license to use the drawings to remodel Mrs. Jones' home, there logically must flow a right to complete the drawings so that they can be used for their intended purpose." (Reply Brief, p. 4).

Finally, relying on *Effects Associates, Inc. v. Cohen*, 908 F.2d 555 (9th Cir.1990), Defendants argue that completion of the plans and payment in full are not conditions precedent to enforcement of the license agreement. In *Effects Associates*, a movie maker subcontracted with another film maker for special effects footage to be incorporated into a science fiction film he planned to produce. Because the movie maker was dissatisfied with the footage, he paid the company only one half of the contract price. Nevertheless, he incorporated the footage into the film and arranged for its distribution. The special effects producer claimed copyright infringement, arguing that the footage could not be used unless the price were paid in full. The court disagreed, concluding that the special effects producer had granted the movie maker an implied nonexclusive license to use the footage in his film. "Effects created a work at defendant's request and handed it over, intending that defendant copy and distribute it." *Id.* 558. The court also noted that it could not "construe payment in full as a condition precedent to implying a license. Conditions precedent are disfavored and will not be read into a contract unless required by plain, unambiguous language. *Id.* 559 n. 7 (citation omitted).

### 2. *Principals of Copyright Contract Interpretation.*[9]

Generally, transfer of copyrights must be made in writing. 17 U.S.C. § 204(a). However, "[a] nonexclusive license may be granted orally, or may even be implied from conduct." Melville B. Nimmer and David Nimmer, 3 *Nimmer on Copyright* § 10.03[A], at 10–38 (1994) ("*Nimmer*"). "This is not expressly provided in the statutory text, but is negatively implied from the fact that a 'transfer of copyright ownership,' which by definition does not include nonex-

---

8. "A 'derivative work' is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work'." 17 U.S.C. § 101.

9. In so far as Defendants contend that Plaintiffs' copyright infringement charges should be summarily dismissed because resolution of the dispute turns on contract interpretation they are clearly wrong. "Because the federal courts have exclusive jurisdiction to determine statutory infringement, they also have incidental power to hear and decide claims of title that necessarily bear upon the ultimate question of infringement. They may likewise pass on other questions of contract law such as the validity or scope of an assignment or license claimed by the defendant." M. Nimmer and D. Nimmer, 3 *Nimmer on Copyright* § 12.01[A][1][a], at 12–8 (1994). Thus, contract interpretation, which is normally the province of state courts and state law, can become a federal copyright issue.

clusive licenses (see 17 U.S.C. § 101) must be by written instrument. 17 U.S.C. § 204(a)." *Id.* at 10–39 n. 19. *See also Silva v. MacLaine,* 697 F.Supp. 1423, 1430 (E.D.Mich.1988), *aff'd,* 888 F.2d 1392 (6th Cir.1989), *cert. denied,* 495 U.S. 905, 110 S.Ct. 1925, 109 L.Ed.2d 289 (1990); *Pamfiloff v. Giant Records, Inc.,* 794 F.Supp. 933, 938–39 (N.D.Cal.1992). Consequently, in so far as the copyright laws are concerned, nonexclusive licenses to use copyrighted material for a particular purpose need not be in writing.

■■■ Typically, federal courts apply the relevant state law in determining questions of contract. *Nimmer,* at 12–8 n. 19, citing *Bartsch v. Metro–Goldwyn–Mayer, Inc.,* 391 F.2d 150 (2d Cir.), *cert. denied,* 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968); *see also Fantastic Fakes, Inc. v. Pickwick International, Inc.,* 661 F.2d 479 (5th Cir.1981). However, some courts "rely on state law to provide the canons of contractual construction, but only to the extent such rules do not interfere with federal copyright law or policy." *S.O.S., Inc. v. Payday, Inc.,* 886 F.2d 1081, 1088 (9th Cir.1989). In *S.O.S.,* the Ninth Circuit interpreted narrowly a written license to use copyrighted computer software:

> The district court applied the California rule that the contract should be interpreted against the drafter, . . . thereby deeming S.O.S. to have granted to Payday any right which it did not expressly retain. This result is contrary to federal copyright policy: copyright licenses are assumed to prohibit any use not authorized. *Cf. Cohen [v. Paramount Pictures Corp.],* 845 F.2d [851] at 853 [ (9th Cir.1988) ] (license analyzed to determine what uses it affirmatively permits); 17 U.S.C. § 204(a) (transfer of copyright ownership must be in writing).

*S.O.S.* at 1088; *see also Fantastic Fakes, Inc. v. Pickwick International, Inc.,* 661 F.2d 479 (5th Cir.1981). Nevertheless, none of these cases abandon the basic canon of contract construction that requires an examination of the parties' intent.[10] Interpretation of a contractual license in light of copyright policy is necessary only if intent cannot be otherwise ascertained from contract language and surrounding circumstances. *See ABKCO Music, Inc. v. Westminster Music, Ltd.,* 838 F.Supp. 153 (S.D.N.Y.1993) (special rules based on copyright policy need be applied only if the general language in the contract or surrounding circumstances fail to indicate which party should have the right to publication in newly invented mediums); *South–Western Publishing Co. v. Simons,* 651 F.2d 653 (9th Cir.1981), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982) (where contract in dispute failed to specifically state that renewal copyrights were transferred, language in subsequent contracts and transferor's failure to object when the transferee obtained renewal of copyrights demonstrated original intent of parties).

**3.** ***Summary Judgment is Not Appropriate.***

■■■ Contrary to Defendants' arguments, *Effects Associates, supra,* differs significantly from the case currently before this Court. In *Effects* the intent of the parties, insofar as *use* of the copyrighted materials was concerned, was not at issue. The special effects footage was created for the purpose of insertion into a larger work, and was used in precisely that way. Rather, the dispute involved when the license became effective—before or after the transfer of the contract price. In contrast, Johnson claims that Defendants used his architectural plans and drawings in ways that he did not intend when he initially agreed to work for Jones. Although he may have implicitly agreed to allow Jones to use *completed* architectural plans to renovate her home, it does not necessarily follow that he intended to allow Jones to use *partially* completed plans for this purpose. In short, this case is not just about failure to pay a bill.

■■■ Plaintiffs correctly argue that all of the circumstances surrounding the negotiations made between the parties must be considered to determine if and to what extent an implied license was granted. *Cf. Effects* at 558 n. 6; *Silva v. MacLaine,* 697 F.Supp. 1423, 1430 (E.D.Mich.1988), *aff'd,* 888 F.2d

---

**10.** *See, e.g., Klever v. Klever,* 333 Mich. 179, 52 N.W.2d 653 (1952).

1392 (6th Cir.1989), *cert. denied,* 495 U.S. 905, 110 S.Ct. 1925, 109 L.Ed.2d 289 (1990). At least some of that evidence, most notably Johnson's proposed contracts, tends to show that Johnson did not intend to relinquish control of his incomplete drawings either when he agreed to prepare the plans, or when he gave copies of the incomplete plans to Jones. Plaintiff's failure to retrieve the partially complete plans is relevant to the inquiry, but is not as probative as Defendant's heavy reliance on it implies.

> Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object ... in which the work is first fixed, does not of itself convey any rights in the copyrighted work....

17 U.S.C. § 202. *See also MacLean Assoc. v. Wm. M. Mercer–Meidinger–Hansen,* 952 F.2d 769, 779 (3rd Cir.1991) (delivery of a copy is only one factor that may be considered in determining whether an implied license has been granted).

Although cases involving questions of intent are not necessarily inappropriate for summary judgment, *see Street v. J.C. Bradford & Co., supra,* 886 F.2d at 1479, it is "seldom appropriate in cases where the parties' intentions or states of mind are crucial elements of the claim because of the likelihood of self-serving testimony and the necessity for the factfinder's credibility determination." *60 Ivy Street v. Alexander,* 822 F.2d 1432, 1437 (6th Cir.1987); *accord Middleton v. Reynolds Metals Co.,* 963 F.2d 881, 882 (6th Cir.1992); *Canderm Pharmacal v. Elder Pharmaceuticals, Inc.,* 862 F.2d 597, 601 (6th Cir.1988); *Smith v. Hudson,* 600 F.2d 60, 66 (6th Cir.1979). *Effects* involved a written contract that did not specifically discuss copyright transfer. Here, Defendants do not ask the Court to find a license implied by the terms of an otherwise explicit contract, but rather to first find the terms of the underlying agreement (through the actions and spoken words of the parties) and then to find a license implied by this agreement. With lack of documentation on two levels, many gray areas of fact remain unresolved, making this case poorly suited to summary disposition.

In short, based on the evidence currently before this Court, a reasonable trier of fact could conclude that Johnson intended to grant a license to Jones to use the plans for renovation of her home, but only if the plans were actually completed by himself.[11] Therefore, summary judgment in favor of the Defendants is inappropriate at this time.

### C. *PLAINTIFFS' TRADEMARK CLAIM SHOULD BE SUMMARILY DISMISSED AS TO DEFENDANTS JONES, UZNIS AND UZNIS DENEWETH CO.*

Count IV of Plaintiffs' amended complaint alleges that "defendants have taken plaintiff Johnson's copyrighted Technical Drawings, copied them with plaintiff Johnson's name removed and subsequently affixed a Progressive Associates symbol on plaintiff Johnson's Technical drawings which is likely to cause confusion with members of the public as to the origin of the Technical Drawings." Furthermore, "defendants Tosch and Progressive Associates, or their representatives, have, and continue to do so, falsely represent to others that they are the origin of the Technical Drawings." (Amended Complaint, ¶¶ 56, 57). These actions, according to Plaintiffs, constitute wilful violation of the Lanham Act, which states:

> (a)(1) **Any person who,** on or **in connection with any** goods or **services,** or any container for goods, **uses in commerce any work,** term, name, symbol, or device, or any combination thereof, **or any false designation of origin,** false or misleading description of fact, or false or misleading representation of fact, **which—**
>
> > (A) **is likely** to cause confusion, or to cause mistake, or **to deceive** as to the affiliation, connection, or association of such person with another person, or **as to the origin,** sponsorship, or approval

---

**11.** Because material issues of fact remain on whether and to what extent a copyright license was granted to Jones, the Court finds it unnecessary to address Plaintiffs' statute of frauds argument at this time.

**of his or her** goods, **services,** or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

**shall be liable** in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (emphasis added).

In their motion for summary judgment on count IV, Defendants Theresa C. Jones, John Uznis and Uznis Deneweth Co. claim that they have not done any of the acts alleged by Plaintiffs in this count. They support this contention with affidavits signed by Jones and Uznis, both of which state: "I have not taken Plaintiff Johnson's copyrighted technical drawings, copied them with Plaintiff Johnson's name removed and subsequently affixed a Progressive Associates' symbol on Plaintiff Johnson's technical drawings."

As with their apparent concession concerning the validity of Johnson's copyrights, these Defendants do not dispute the merits of Plaintiffs' trademark claim. Rather, they argue that they cannot be held accountable for the acts of Defendants Tosch and Progressive Associates.

Plaintiffs argue that Jones, Uznis and Uznis Deneweth Co. are liable as contributory or vicarious trademark infringers. According to Plaintiffs, all of the Defendants worked closely together and must be considered jointly responsible. Furthermore, Plaintiffs claim that Uznis was contractually obligated to Jones to supervise the activities of the architect, and to report back to her. In reply, Defendants Jones, Uznis and Uznis Deneweth Co. argue that there is no evidence of an agency relationship between Tosch and themselves; rather, Tosch and Progressive Associates were independent contractors. Furthermore, there is no evidence that Jones or Uznis had any knowledge of Tosch's relabelling activities.

Plaintiffs rely on *Aitken, Hazen, Hoffman, Miller v. Empire Construction Co.,* 542 F.Supp. 252 (D.Neb.1982), in support of their argument. However, this case concerns copyright infringement rather than violation of the Lanham Act. In *Sony Corp. v. Universal City Studios,* 464 U.S. 417, 439 n. 19, 104 S.Ct. 774, 787 n. 19, 78 L.Ed.2d 574 (1984), the Supreme Court noted a distinction between the standards for contributory infringement applied in these two types of cases. *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982), sets forth the standard for trademark contributory infringement claims.

In *Inwood,* the Court recognized that "liability for trademark infringement can extend beyond those who actually mislabel goods with the mark of another." 456 U.S. at 853, 102 S.Ct. at 2188. But some culpability is required:

> Even if a manufacturer does not directly control others in the chain of distribution, it can be held responsible for their infringing activities under certain circumstances. Thus, if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily responsible for any harm done as a result of the deceit.

*Id.,* 456 U.S. at 853–854, 102 S.Ct. at 2188. *See also William R. Warner & Co. v. Eli Lilly & Co.,* 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161 (1924).

Plaintiffs have failed to come forward with any evidence either contradicting the affidavits of Jones and Uznis concerning their actual knowledge, or in support of their claim that Jones and Uznis should have anticipated the infringing activity. For this reason, summary judgment in favor of Defendants Jones, Uznis and Uznis Deneweth Co. on court IV of Plaintiffs' complaint is in order.

Inexplicably, Defendants Tosch and Progressive Associates chose to concur in their co-defendants' motion for summary judgment on count IV without submitting any independent analysis. Clearly, Jones, Uznis and Uznis Deneweth Co. have not presented any argument that would warrant dismissal of the trademark infringement claim against Tosch and Progressive Associates. Indeed,

their argument indicates that if anyone is liable it is these Defendants. Thus, Tosch and Progressive Associates' request for summary judgment on this count must be denied.

### IV. *CONCLUSION*

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' motion for summary judgment on counts I and II of Plaintiffs' complaint be DENIED; and that Defendants' motion for summary judgment on count IV of Plaintiffs' complaint be GRANTED as to Defendants Jones, Uznis and Uznis Deneweth Co., but DENIED as to Defendants Tosch and Progressive Associates.