**FRED AHLERT MUSIC CORP.,**
**d/b/a Olde Clover Leaf**
**Music, Plaintiff,**

v.

**WARNER/CHAPPELL MUSIC,**
**INC., Defendant.**

**No. 96 Civ. 0985 (HB).**

United States District Court,
S.D. New York.

April 14, 1997.

Robert C. Osterberg, Abelman, Frayne & Schwab, New York City, for Plaintiff.

Eugene L. Girden, Victor Rivera, Shukat, Arrow, Hafter & Weber, L.L.P., New York City, for Defendant.

Frederick F. Greenman, Deutsch, Klagsbrun & Blasband, New York City, for Amici Curiae, The Songwriters Guild of America and The Authors Guild, Inc.

BAER, District Judge.

In this case, the parties agree that there exists no factual dispute and that the case simply involves questions of law as to the scope of an exception under the extended renewal terms added to the Copyright law in 1976 (17 U.S.C. § 304) and thus both move for summary judgment. Plaintiff seeks declaratory and monetary relief, and defendant cross-claims for similar relief. For the reasons stated below, plaintiff's motion for summary judgment is granted, defendant's cross claims are dismissed and defendant's motion for summary judgment is denied.

### I. *Background*

The song "Bye, Bye Blackbird" (the "Song") was written by Mort Dixon and Ray Henderson. They registered the Song on May 3, 1926 and the copyright was renewed in the names of the authors on May 6, 1953. The copyright would have expired on December 31, 1982; but a 1976 revision of the copyright law extended the renewal term for an additional nineteen years (the "Extended Renewal Term"). *See* 17 U.S.C. § 304 (West 1996). After renewing, Mr. Dixon and Mr. Henderson assigned their interests in the copyright to defendant Warner–Chappell's predecessor in interest.

On or about May 2, 1969, defendant granted A & M Records ("A & M") a mechanical license, which provided for a "non-exclusive license to use, in whole or in part, [defendant's] copyrighted musical composition entitled BYE BYE BLACKBIRD (Dixon–Henderson) in the recording and manufacturing of phonograph records to be manufactured and sold only in the United States...." The license stated that it "covers only the particular recording mentioned herein ... and is personal and non-assignable." On the bottom of the license is typed "RECORD NO. SP 4182, RECORDING ARTIST Joe Cocker." In 1969, A & M produced a version of the song recorded by Joe Cocker (the "Cocker Derivative").

As noted, the Copyright Act of 1976 extended the term of a copyright given to any work under the Copyright Act of 1909 by nineteen years. It also created a mechanism by which previous copyright grants could be terminated. In 1982, after the authors died and pursuant to this second provision of 17 U.S.C. § 304, the children of Mr. Dixon and Mr. Henderson terminated defendant's United States copyright interest in the Song for the Extended Renewal Term (1982 through 2001) and transferred all of their copyright interest in the Song to plaintiff Fred Ahlert Music Corp. ("Ahlert") for the duration of the Extended Renewal Term. In this lawsuit, Ahlert represents only the Dixon children.

In mid–1992, TriStar Pictures, Inc. ("TriStar") contacted plaintiff for a quotation to use the Song in the motion picture "Sleepless in Seattle" ("Sleepless"). Plaintiff provided TriStar with a quote for use in the United States of the copyright and alerted TriStar to contact defendant for a quote for foreign uses of the copyright.[1] In April 1993, plaintiff issued a synchronization license[2] to TriStar that specified 6 separate recordings: five

---

1. While the Dixon family terminated defendant's right to use the song in the United States, defendant retained a grant to license the song everywhere else in the world except the United States.

2. A synchronization license allows a film company to use a song in a movie in synchronization with an on-screen image. In contrast, a mechanical license is a grant to use the copyrighted work in the manufacture and distribution of phonorecords.

background instrumental uses and one background vocal use.

However, when TriStar made the soundtrack for the movie (the "Sleepless Soundtrack"), it used an edited version of the 1969 Cocker Derivative for the background vocal use. Sony Music Entertainment Inc. ("Sony"), an affiliate of TriStar, obtained the right to make and distribute the Sleepless Soundtrack Album, which included the full version of the Cocker Derivative. In July 1993, plaintiff (through its mechanical licensing agent, the Harry Fox Agency, Inc. ("Fox")) issued a mechanical license to Sony in exchange for Sony's agreement to pay plaintiff a royalty fee for each phonorecord of the Sleepless Soundtrack Album made and distributed. According to plaintiff, defendant (also represented by Fox) called Fox and caused Fox to cancel plaintiffs mechanical license and instead issue one to Sony on behalf of defendant. Ahlert protested and initiated this cause of action.

## II. *Discussion*

As noted, the 1976 amendment to the copyright law extended the term of a copyright by nineteen years and, pursuant to 17 U.S.C. § 304(c), allows authors of copyrighted material and their statutory heirs to terminate grants of copyright interest anytime between the 56th to 61st years after issue, if the copyright in question was a pre–1978 copyright. These changes were intended to protect the owners of copyrighted works and their families. *See Woods v. Bourne Co.,* 60 F.3d 978, 978 (2d Cir.1995). Once the copyright was terminated, all rights under the terminated grant reverted to the author or his statutory heirs. 17 U.S.C. §§ 203(b), 304(c)(6). Congress, however, carved out an exception to the rights that revert back in the Derivative Works Exception, which provides:

A derivative. work prepared under authority of the grant before its termination may continue to be utilized *under the terms of the grant* after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant. 17 U.S.C. §§ 304(c)(6)(A) (emphasis added).

A derivative work is defined by the Copyright Act as:

a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgement, condensation, or any other form in which a work may be recast, transformed or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications, which, as a whole, represent an original work of authorship, is a "derivative work."

17 U.S.C. § 101.

The Supreme Court analyzed Section 304 and the Derivative Works Exception in *Mills Music v. Snyder,* 469 U.S. 153, 105 S.Ct. 638, 83 L.Ed.2d 556 (1985). In Mills, the Court considered the competing claims of the owner of a renewal copyright, a music publisher, and an author's successors to receive the royalties payable after termination for sales of phonorecords made during the Extended Renewal Period. *Id.* The Court found that in Section 304 the phrase "under the authority of the grant" encompassed the original grant as well as the subsequent licenses that were issued while the grant was in place. *Id.* at 166–67, 105 S.Ct. at 646–47. Therefore, the owner of the renewal copyright, here plaintiff, was entitled to receive royalties pursuant to licenses it issued under the grant even after such grant was terminated by defendant. *Id.* at 178, 105 S.Ct. at 652–53. The Second Circuit has interpreted Mills "to require that where multiple levels of licenses govern the use of a derivative work, the 'terms of the grant' encompass the original grant from the author to the publisher and each subsequent grant necessary to enable the particular use at issue." *Woods v. Bourne Co.,* 60 F.3d 978, 987 (2d Cir.1995). Essentially, the Mills Court concluded that the derivative works exception "freezes authorized uses and royalty arrangements as of the 'time of termination'" of the grant. See Amici Mem. at 14. In other words, where a derivative work was licensed and created before termination, the termination provisions and Derivative Works Exception of Section

304, read together with the holding in *Mills* provides that:

    a) all rights covered by the terminated license revert˙to the author or his statutory heirs, except

    b) use of the derivative work may continue after termination

    c) pursuant to those terms of the license

    d) that were in effect at the time of termination.

Amici Mem. at 14.

Neither party disputes that *Mills* controls here and neither party disputes that the Cocker Derivative is a "derivative work prepared under authority of the grant" from Dixon and Henderson to defendant. Plaintiff, however, contends that defendant is not entitled to royalties for the Sleepless Soundtrack Album[3] because, "under the terms of the grant", the only rights that defendant retained after termination were limited by its license with A & M. Put another way, plaintiff claims that the only right that defendant may retain with respect to the composition is to those royalties that arise from the production of phonorecords of the Cocker Derivative. Defendant, on the other hand, argues that the original grant is unambiguous in that there were no limitations on its terms, and further that the license to A & M in no way limits defendant's rights because it was a non-exclusive license to use the Joe Cocker recording of the Song.

We look then at the scope of the license given by the defendant to A & M and when we do so, with the aid of well-established principles of contract interpretation, the "primary objective '... [must be] to give effect to the intent of the ... parties as revealed by the language they chose to use.'" *Bourne v. Walt Disney*, 68 F.3d 621, 628–29 (2d Cir. 1995) (quoting *Seiden Assocs. v. ANC Holdings*, 959 F.2d 425, 428 (2d Cir.1992)). Where contract language is unambiguous, its meaning is a matter of law to be determined by the court. *Id.* Contract language is unambiguous "when it has a definite and precise meaning." *Id.* Moreover, in interpreting

contract language, the court should determine "'what is the intention of the parties as derived from the language employed.'" *EMI Catalogue Partnership v. CBS/Fox Co.*, 1994 WL 163700 at *3 (S.D.N.Y. Apr. 28, 1994).

Here the language of the A & M license states that it is a "non-exclusive license to use, in whole or in part, [defendant's] copyrighted musical composition BYE BYE BLACKBIRD in the recording and manufacturing of phonograph records to be manufactured and sold only in the United States." The license further specifies that it "covers only the particular recording mentioned herein," and at the bottom of license is specified "RECORD NO. SP 4182 RECORDING ARTIST Joe Cocker."

While this precise language has not been interpreted heretofore, decisional law does address whether or not a license contemplates a particular media even when that media was unspecified in the license. Defendant here relies on *ABKCO Music, Inc. v. Westminster Music, Ltd.* for the proposition that this circuit favors the view that a license should include any uses which may be reasonably read to fall within the license's scope. 838 F.Supp. 153, 155 (S.D.N.Y.1993). *See also Bartsch v. Metro–Goldwyn–Mayer, Inc.*, 391 F.2d 150, 155 (2d Cir.1968). While this, what might be characterized as the expansive view, is the law in this Circuit, the concept as enunciated by the Circuit does not embrace the case at bar. In those cases in which courts held that the scope of the license included uses not actually specified in the license, the license contained very broad language wherein it was reasonable to assume the *use* fell within the scope of the license. *See e.g., ABKCO* 838 F.Supp. at 154 (where the license conveyed "all rights" in a music composition); *Bourne v. Walt Disney*, 68 F.3d 621, 625 (2d Cir.1995) (where license granted right to mechanically and/or electrically record music composition with "any and all" of Disney's movies); *Platinum Record Company v. Lucasfilm, Ltd.*, 566 F.Supp. 226, 227 (D.N.J.1983) (where license con-

---

**3.** While plaintiff also requests that this Court declare that the plaintiff and not the defendant is entitled to license the Cocker Derivative, excluding phonorecords made and distributed by A & M records identified as "Record No. SP 4182," I address the royalties issue for convenience and because this is the issue on which the parties focus. Simply because the parties' arguments are not specifically mentioned does not mean they are not addressed.

veyed right to exhibit, distribute, exploit, market and perform motion picture by "any means or methods").

By contrast, the language here is very narrow and grants to A & M only the right to manufacture phonorecords of the Joe Cocker recording on Record No. SP 4182. *See Rey v. Lafferty,* 990 F.2d 1379, 1390–91 (1st Cir.1993) (holding license for right to show film episodes for television did not encompass right to distribute same on videocassette where license granted right to use film "solely for broadcast on television"). Defendant argues that the license's language does not suggest any limitation because the current licenses issued by the parties include *additional* limiting language.[4] While this additional language may make the limitation language *clearer,* it by no means supports the proposition that the older license's language does not evidence such a limitation. Licensors' more sophisticated manner of describing its intent cannot diminish the meaning of an earlier expression of the same intent. Consequently, the language of the license must be interpreted to retain for the defendant the right to license the Cocker Derivative for manufacturing Record No. SP 4182.[5] All of the rights in the Cocker Derivative, other than the manufacture of phonorecords, are part of the rights that reverted back to plaintiff upon termination of the grant.[6] Therefore, it is plaintiff that has the right to receive the royalties for the Sleepless Soundtrack Album.[7]

---

4. The new limiting language states that the license " 'is limited to *one* particular recording of said copyrighted work *as performed by the artist and on the phonorecord number identified* … ' " Def.'s Mem. at 6 (quoting Pl.'s Exs. 12, 18).

5. The significance of this record number is explained in *Kohn on Music Licensing* which explains that by using a record number on a license, a licensor limits the license to that configuration (i.e., phonorecord rather than CD), so that if the licensee wishes to use a different configuration, he must obtain another license. *See id.* 666–67 (2d ed.1996). Although Mr. Kohn has submitted an affidavit on behalf of defendant that explains this provision, he appears to concede this point. *Kohn Aff.* ¶ 7(a).

6. The Court has not ignored in its analysis defendant's argument that the A & M License in no

## II. *Conclusion*

For the reasons stated above, plaintiff's motion for summary judgment is GRANTED, while defendant's is DENIED. Defendant's counterclaims are dismissed. The Clerk of the Court is directed to close this case.

SO ORDERED.

---

way limits its rights to the exploitation of the Cocker Derivative. As Amici points out, however, defendant's interpretation of the license results in the "[reliance] on the provision of the license which allows [defendant] to continue receiving royalties" and the "disregard [of] the other provisions of the same license which limit" defendant's rights. *See* Amici Mem. at 4.

7. The parties also dispute whether or not the Sleepless Soundtrack and the Soundtrack Album are derivative works prepared after termination of the grant and therefore outside the scope of the Derivative Works Exception. Because I find that use of the Cocker Derivative other than in manufacturing Record No. SP 4182 would not be "under the terms of the grant," I do not reach the issue of whether or not the Sleepless Soundtrack or the Sleepless Soundtrack Album are new derivative works and thus not within the Derivative Works Exception.