

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-09-00051-CV

GAME SYSTEMS, INC. A/K/A                                    APPELLANT
TEXAS GAME SYSTEMS

V.

FORBES HUTTON LEASING, INC.                               APPELLEES
AND GAMETRONICS GAMING
EQUIPMENT LIMITED; AND
ROBERT HOUCHIN

------------

## FROM THE 236TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

----------

In nineteen issues, Game Systems, Inc. a/k/a Texas Game Systems appeals from the trial court's denial of its motion for summary judgment against and the grant of summary judgment for Forbes Hutton Leasing, Inc. (Leasing), Gametronics Gaming Equipment Limited (Tronics), and Robert Houchin

---

[1]*See* Tex. R. App. P. 47.4.

(Houchin) (collectively Appellees). We affirm in part and reverse in part. Because we hold that the trial court erred by granting summary judgment on Leasing's claim for breach of a loan royalty agreement and on Game Systems's usury claim, we reverse the trial court's summary judgment as to those claims. We remand the case to the trial court for further proceedings on these claims. Because we hold that the trial court erred by awarding unconditional appellate attorney's fees to Tronics and Leasing, we reverse the judgment of appellate attorney's fees. Because we hold that the trial court did not err by granting summary judgment on the remaining claims, we affirm the trial court's judgment as to those remaining claims.

## I. Background

In 2001, Johnny Weaver and Houchin began doing business together as Texas Gaming Systems and ultimately incorporated Game Systems, Inc. (Game Systems). Weaver and his wife were named directors. Houchin was hired as president, and Mark Olmstead was hired as vice president. In 2002, Weaver, Houchin, Olmstead, and another person not involved in these proceedings formed Entertainment Merchandising Technology, LLC (EMT).

In 2003, Game Systems entered into a licensing agreement with Tronics, as set out in a "letter of intent," to develop software for use in Game Systems's terminals. In the trial court below, the parties produced and relied on different versions of this letter of intent, both stating the same effective date and signed by the same parties—Houchin, Olmstead, and Fernando Di Carlo, president of

2

Tronics.  Each version has an attached "Schedule B," initialed by Houchin and Di Carlo but not Olmstead, but the Schedule Bs produced are not identical.  At a hearing in the trial court, Di Carlo testified that he could not be sure which version of Schedule B was actually attached to the final fully executed and signed letter of intent.

In July 2003, EMT filed a trademark application for Hello Money, which the application describes as prepaid phone cards.  Game Systems began developing a sweepstakes, called Hello Money, in which customers purchased calling cards, which enabled them to play a sweepstakes game.

As a part of its business, Game Systems built "sweepstakes validation terminals," cabinets in which computers were placed for customers to play sweepstakes games.  Game Systems placed these terminals with distributors.

In 2004, Game Systems began receiving outside funding, the source of which was contested in the trial court.  Game Systems contended that this money came from Tronics; Leasing asserted that the money came from a different entity, Forbes/Hutton Financial Corp. (Financial).  As with the letter of intent, the parties produced two different versions of a loan document that are remarkably similar.  Both versions of the "loan royalty agreement" cover the same subject matter, provide the same loan amount on substantially the same terms for the same purpose, and have the same stated effective date.  Game Systems produced a loan royalty agreement (LRA1) between Financial and Tronics, signed by Di Carlo and Arnold Milan, chairman and CEO of Financial,

3

and witnessed by a third party. Leasing produced a different loan royalty agreement (LRA2), which is substantially the same as LRA1 but names both Game Systems and Tronics as borrower rather than just Tronics and was signed by Milan, Di Carlo, and Houchin on behalf of Game Systems. Unlike LRA1, LRA2 does not bear the signature of a third party witness to the signatures of Milan, Di Carlo, and Houchin. Under both agreements, Financial agreed to lend $3,000,000, dispersed in weekly increments, to build and install 2,000 terminals to run the Hello Money software. Both versions contain a provision for repayment out of game revenue as well as an agreement to pay Financial a percentage of gross revenues from the terminals after the loan repayment. Neither version provides the signing date, but both versions state that the agreement was "made effective as of" May 7, 2004.

In September 2004, Houchin filed a patent application in his name as the inventor of a "[m]ethod and [a]pparatus for [c]onducting a [s]weepstakes." The application states that it is a continuation of a patent application that had been previously filed on November 4, 2003.

On November 17, 2004, Houchin resigned from Game Systems and transferred his interest in the company, if any, to Di Carlo as trustee. Two days later, Houchin filed a "Certificate of Ownership For Unincorporated Business or Profession" in the Assumed Name Records in Tarrant County; the certificate states that he owns a limited partnership called Gametronics of Texas.

4

In February 2005, Game Systems signed a one-year distributor agreement with Seven Sky Inc., an Alabama limited liability company. Under this agreement, Game Systems appointed Seven Sky as an agent to "distribute, promote[,] and conduct" Game Systems's "promotional phone card system" using Class II "games and game devices."

In March 2005, Leasing and Tronics sent cease and desist letters to some of Game Systems's distributors, including Seven Sky, demanding that they turn over to Leasing the machines and all funds owed to Game Systems. Leasing designated Houchin as its agent in Texas for the purpose of repossessing Hello Money terminals covered by a lease agreement between Game Systems and Leasing. Game Systems disputed the validity of the lease at trial.

The lease, like LRA2, does not indicate the date it was signed but states an effective date of July 19, 2004. The lease states that Leasing owned "certain equipment, goods and chattels as described in Schedule 'A,'" which describes the equipment as "2[,]000 Hello Money Sweepstakes Validation Terminals." Leasing agreed to lease the equipment to Game Systems "at the rates set out in Schedule 'B.'" Schedule B sets a monthly lease rate of ten dollars per month. The lease further provides that "[t]he [e]quipment shall at all times remain the property of [Leasing] . . . until the repayment of the principal as stated in the Loan Royalty Agreement signed May 7[,] 2004" and that "until such time, [Game Systems's] interest in the [e]quipment will be as renter only." The lease does not specify the parties to the loan royalty agreement referenced, nor does it specify

5

whether the 2,000 terminals covered by the lease are the terminals that Game Systems had already built, the 2,000 terminals that Game Systems was supposed to build with funds provided under the loan royalty agreement, or other terminals that Leasing had built and provided to Game Systems. The lease was signed on behalf of Game Systems by Houchin. In the trial court, Game Systems contended that it had not received a copy of the lease until after Houchin had left the company and that it "has in fact always owned and manufactured its own terminals and has never leased any equipment."

On March 17, 2005, Leasing and Tronics filed suit against Game Systems, seeking a temporary restraining order and a temporary injunction. They also asserted claims for breach of contract, conversion, theft of intellectual property, and an accounting and sought a declaratory judgment that Game Systems had no right to use the software and that Leasing had the right to take possession of the terminals. Game Systems filed a countersuit for breach of fiduciary duty, fraud, tortious interference with contract, conversion, breach of contract, usury, misappropriation of trade secrets, and an accounting.

Game Systems also sued Houchin as a third-party defendant. Houchin filed an answer asserting various defenses and affirmative defenses. He also countersued Game Systems for indemnity. At some point, the cause was stayed while Game Systems went into and then out of bankruptcy. During the bankruptcy proceedings, Game Systems removed the state action to the

6

bankruptcy court. After dismissing the bankruptcy action, the bankruptcy judge remanded the state case back to state district court.

Houchin moved for traditional summary judgment on his affirmative defenses and a no-evidence summary judgment on Game Systems's claims against him. Leasing and Tronics moved for traditional summary judgment on their claims for breach of contract and on Game Systems's claim for usury. They also moved for no-evidence summary judgment on all of Game Systems's claims. They subsequently filed supplemental summary judgment evidence, which included an assignment by Financial to Leasing of Financial's claim "arising out of or relating to" LRA2. The assignment was signed "on or about June 5, 2008 to be effective January 1, 2008."

Game Systems moved for no-evidence summary judgment on all of Houchin's affirmative defenses. It also moved for no-evidence summary judgment on its own claim for breach of fiduciary duty against Tronics and Houchin.

The trial court granted Houchin's motion for summary judgment without specifying the grounds. The trial court also granted summary judgment for Leasing on its claim for breach of the lease and for Tronics on its claim for breach of the loan royalty agreement and entered a take nothing judgment on all of Game Systems's claims and defenses. The trial court denied Game Systems's summary judgment motions.

7

## II. Standard of Review

### A. Traditional Summary Judgment

We review a summary judgment de novo.[2] We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not.[3] We indulge every reasonable inference and resolve any doubts in the nonmovant's favor.[4] A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim.[5]

A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim.[6] A defendant is entitled to summary judgment if it conclusively negates at least one essential element of the plaintiff's cause of action.[7] A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of

---

[2]*Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

[3]*Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

[4]*20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

[5]*Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c).

[6]See Tex. R. Civ. P. 166a(a), (c); *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986).

[7]*Frost Nat'l Bank*, 315 S.W.3d at 508; *see* Tex. R. Civ. P. 166a(b), (c).

the affirmative defense.[8]  To accomplish this, the defendant-movant must present summary judgment evidence that conclusively establishes each element of the affirmative defense.[9]

## B. No-Evidence Summary Judgment

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant's claim or defense.[10]  The motion must specifically state the elements for which there is no evidence.[11]  The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact.[12]

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion.[13]  We review a no-evidence summary judgment for evidence that would enable reasonable and fair-

---

[8]*Frost Nat'l Bank*, 315 S.W.3d at 508–09; *see* Tex. R. Civ. P. 166a(b), (c).

[9]*See Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008).

[10]Tex. R. Civ. P. 166a(i).

[11]*Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009).

[12]*See* Tex. R. Civ. P. 166a(i) & cmt.; *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

[13]*Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006).

minded jurors to differ in their conclusions.[14] We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not.[15] If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper.[16]

### III. Analysis

Game Systems brings nineteen issues on appeal. In Game Systems's first issue, it makes the general assertion that the trial court erred by granting summary judgment to Appellees. There are two methods of phrasing issues or points to complain about trial court error in granting summary judgment. An appellant may raise a single issue that complains, "The trial court erred in granting the motion for summary judgment"; such an issue allows the appellant to brief all possible grounds upon which summary judgment should have been denied.[17] This issue is commonly known as a "*Malooly* issue." Alternatively, an

---

[14]*Hamilton*, 249 S.W.3d at 426 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)).

[15]*Timpte Indus.*, 286 S.W.3d at 310 (quoting *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)).

[16]*Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004).

[17]*Malooly Bros., Inc. v. Napier*, 461 S.W.2d 119, 121 (Tex. 1970); *see also Plexchem Int'l, Inc. v. Harris Cnty. Appraisal Dist.*, 922 S.W.2d 930, 930–31 (Tex. 1996).

appellant may list as a separate issue each ground that the movant failed to prove as a matter of law and upon which the trial court might have based its judgment.[18]

Game Systems appears to do both. Instead of one issue supported by arguments attacking each ground for summary judgment, Game Systems asserts a *Malooly* issue and then also asserts separate issues attacking each ground. Game Systems does not have a separate argument section specifically supporting the *Malooly* issue. We consider below the arguments that Game Systems actually briefed. To the extent that Game Systems asserts under this issue any arguments not argued elsewhere in its brief, this issue is overruled.[19]

## A. Game Systems's Breach of Fiduciary Duty Claim

In its second issue, Game Systems argues that the trial court erred by granting summary judgment on its breach of fiduciary duty claims against Appellees because a fact issue exists as to whether they breached the duty of loyalty and whether the breach injured Game Systems or benefitted Appellees. In its petition, Game Systems alleged that Houchin and Di Carlo breached their fiduciary duties to Game Systems and that Tronics and Leasing knowingly participated in these breaches.

---

[18]*Malooly Bros., Inc.*, 461 S.W.2d at 121.

[19]*See* Tex. R. App. P. 38.1(i); *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) (discussing "long-standing rule" that issues may be waived due to inadequate briefing).

11

*1. Against Leasing*

In Tronics and Leasing's joint motion for summary judgment on Game Systems's breach of fiduciary duty claim, they argued that there was no evidence that Houchin and Di Carlo breached a fiduciary duty to Game Systems, that a breach resulted in injury to Game Systems or benefited Houchin or Di Carlo, or that Leasing or Tronics knowingly participated in any breach. In response, Game Systems asserted that Di Carlo had the burden of producing evidence to show that he did not breach his fiduciary duty.

Leasing did not have a fiduciary relationship with Game Systems, and Game Systems did not allege that Leasing owed it a fiduciary duty. Leasing could nevertheless be liable on a breach of fiduciary duty claim if it knowingly participated in a breach of duty by a fiduciary.[20] But Leasing asserted in its no-evidence motion that Game Systems had no evidence that it had knowingly participated in any breach of fiduciary duty. Game Systems was therefore required to point out evidence that raised a fact issue on this element of its claim.[21] Game Systems did not do so. Thus, the trial court correctly granted summary judgment for Leasing on this claim.

---

[20] *See Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 574, 160 S.W.2d 509, 514 (1942) ("[W]here a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such."); *see also ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 881 (Tex. 2010).

[21] *See* Tex. R. Civ. P. 166a(i) & cmt.

*2. Against Tronics*

Like Leasing, Tronics alleged that there was no evidence that it had knowingly participated in a breach of fiduciary duty. Tronics also asserted that there was no evidence that its president, Di Carlo, breached any fiduciary duty to Game Systems. In response, Game Systems argued that Tronics had the burden of producing evidence that transactions between Di Carlo and Game Systems were fair and equitable to Game Systems.

Game Systems argued that Di Carlo owed it a fiduciary duty because he served as one of its directors. If a director causes a corporation to engage in a transaction in which he has an interest,[22] this can (though not necessarily) constitute a breach of his fiduciary duty to the corporation.[23] If the validity of this transaction is challenged, the director has the burden of establishing that the

---

[22]*See Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 719–20 (5th Cir. 1984) (noting that under Texas law a director is considered "interested" in a transaction if the director (1) makes a personal profit from a transaction by dealing with the corporation or usurps a corporate opportunity; (2) buys or sells corporate assets; (3) transacts business in his director's capacity with a second corporation of which he is also a director or significantly financially associated; or (4) transacts business in his director's capacity with a family member).

[23]*See Popperman v. Rest Haven Cemetery, Inc.*, 162 Tex. 255, 258, 345 S.W.2d 715, 717 (1961) (noting that "it is also well settled that officers and directors of a corporation are not disqualified from dealing with the corporation"); *see also* Tex. Bus. Orgs. Code Ann. § 21.418 (West 2010) (providing circumstances under which a transaction by an interested director or officer is valid); *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576 (Tex. 1963) (noting the "equitable principle which calls corporate officers and directors to account to the corporation for personal profits realized by them in breach of their fiduciary duties").

13

transaction is fair to the corporation.[24] But a person does not have to establish the fairness of a transaction with a corporation if the person does not owe a fiduciary duty to the corporation, and of course, if a person does not owe a fiduciary duty to the corporation, then engaging in the transaction cannot constitute a breach of such a duty.[25]

Tronics is not the company alleging that its president, Di Carlo, breached a fiduciary duty—Game Systems is. Before Di Carlo had any burden to justify a transaction in which he was interested (and before Tronics has any burden to justify a transaction it engaged in with Game Systems through Di Carlo), Game Systems first had to establish that Di Carlo owed it a fiduciary duty. Game Systems stated in its pleadings that Di Carlo was a "former member of the board of Game Systems." But Game Systems produced no evidence that Di Carlo had ever served on the board of directors for Game Systems.

Game Systems did, however, produce evidence that Di Carlo had briefly served on an advisory committee created by an operating agreement. This

---

[24]*Landon v. S & H Mktg. Grp., Inc.*, 82 S.W.3d 666, 673 (Tex. App.—Eastland 2002, no pet.); *Popperman*, 162 Tex. at 717, 345 S.W.2d at 717 (noting that "contracts between officers and directors and the corporation itself . . . are binding where the *contracting director* establishes the fairness of the transaction to the corporation") (emphasis added).

[25]*See Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 699 (Tex. App.—Fort Worth 2006, pet. denied) (holding that the trial court did not err by granting a motion for directed verdict on the plaintiff's breach of fiduciary duty claim because there was no evidence that the defendants owed any fiduciary duties).

14

agreement among Houchin, his wife, Weaver, his wife, Olmstead, and Houchin's son-in-law Chris Canard set up operating procedures for Game Systems to resolve unspecified disputes about the business while Houchin and Weaver attempted to negotiate Houchin's purchase of Weaver's interest in the company.[26] The advisory board of which Di Carlo was named a member was to meet once a month, or more if required, to "discuss and decide the current and future business" of Game Systems. The agreement, executed on November 12, 2004, expired by its own terms after sixty days.

Assuming that this agreement created a fiduciary relationship between Di Carlo and Game Systems,[27] nothing in the operating agreement mentions Tronics or shows that Di Carlo had signed the agreement while acting as a representative of Tronics rather than as an individual, and Game Systems did not point out any evidence that it contended raised a fact issue about whether he was acting for Tronics.[28] Furthermore, even if Di Carlo had been acting on behalf

---

[26]*See* Tex. Bus. Orgs. Code Ann. § 21.101(a)(9) (West 2010) ("The shareholders of a corporation may enter into an agreement that . . . grants authority to a shareholder or other person to resolve any issue about which there is a deadlock among the directors, shareholders, or other persons authorized to manage the corporation.").

[27]*See Peckham v. Johnson*, 98 S.W.2d 408, 416 (Tex. Civ. App.—Fort Worth 1936) (noting that a fiduciary relationship can be created by contract), *aff'd*, 132 Tex. 148, 120 S.W.2d 786 (1938); *see also Envtl. Procedures, Inc. v. Guidry*, 282 S.W.3d 602, 628 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (same).

[28]*See Guilbeau v. Anderson*, 841 S.W.2d 517, 519 (Tex. App.—Houston [14th Dist.] 1992, no writ) (stating that a corporation can be held liable for the

15

of Tronics, Game Systems did not allege which acts, if any, Di Carlo took during the sixty days that the agreement was in effect that constituted a breach of fiduciary duty, and Game Systems's summary judgment response pointed to no evidence raising a fact issue on the matter. Nor did Game Systems assert any argument (or any evidence in support of such an argument) that any duty that Di Carlo owed, on behalf of Tronics or otherwise, would continue after the termination of the operating agreement.[29]

Houchin transferred his interest in Game Systems to Di Carlo "as trustee," but he did not do so until November 17, 2004. Houchin testified at the temporary injunction hearing that the transfer was intended to put his ownership interest "in trust with Gametronics." A shareholder, however, generally does not owe a fiduciary duty to a corporation, and although a majority shareholder can owe a fiduciary duty to the corporation,[30] nothing in the record shows that the transfer of

---

torts committed by its agents or employees while acting in the course and scope of their employment); *Douglas v. Aztec Petroleum Corp.*, 695 S.W.2d 312, 319 (Tex. App.—Tyler 1985, no writ) (noting that breach of fiduciary duty is a tort).

[29]*See, e.g.*, *M.R. Champion, Inc. v. Mizell*, 904 S.W.2d 617, 618 (Tex. 1995) (stating that after a partnership terminates, the fiduciary duty that partners owe each other is limited to matters relating to winding up the partnership and that a person has no duty to offer his former partners or partnership a business opportunity that arises after the partnership has terminated).

[30]*See Hoggett v. Brown*, 971 S.W.2d 472, 488 n.13 (Tex. App.—Houston [14th Dist.] 1997, pet. denied); *see also Pabich v. Kellar*, 71 S.W.3d 500, 504 (Tex. App.—Fort Worth 2002, pet. denied) (noting that whether a fiduciary duty exists depends on the circumstances but that "[a] co-shareholder in a closely held corporation does not as a matter of law owe a fiduciary duty to his co-shareholder").

interest made Di Carlo or Tronics the majority stockholder of Game Systems. Thus Game Systems pointed to no evidence suggesting that Tronics owed a fiduciary duty to Game Systems or the other shareholders, even after the transfer, much less evidence that Tronics breached that duty. And in the absence of evidence that Tronics owed it a fiduciary duty, as with its claim against Leasing, Game Systems was required to point out evidence that raised a fact issue on whether Tronics knowingly participated in a breach of fiduciary duty. Game Systems did not do so. Accordingly, the trial court correctly granted the no-evidence motion for Tronics on this claim.

*3. Against Houchin*

Houchin filed a traditional and a no-evidence motion for summary judgment on Game Systems's claims, including a no-evidence motion on Game Systems's breach of fiduciary duty claim against him. Houchin asserted that there was no evidence that he had breached a fiduciary duty to Game Systems or that any such breach resulted in an injury to Game Systems or a benefit to himself. In its response, Game Systems asserted that Houchin had the burden of producing evidence showing that he did not breach his fiduciary duty to Game Systems. It correctly noted that, as stated above, when a fiduciary has benefitted from a transaction with the beneficiary, the burden shifts to the fiduciary to show that the transaction was fair and equitable.[31]

---

[31]*See Popperman*, 345 S.W.2d at 717.

17

Houchin asserted in his motion that there was no evidence that he had benefitted from or that Game Systems had been injured by any such transaction. Game Systems therefore had the burden to respond with some evidence showing that while Houchin owed it a fiduciary duty, he engaged in a transaction with Game Systems, or caused it to engage in a transaction, in which he was interested.[32]  Until Game Systems met that burden showing the existence of such a transaction, Houchin had no burden to show that such transaction was fair and equitable to Game Systems.[33]

In its response, Game Systems referred the trial court to facts presented in paragraph twenty-two of its response.  But in paragraph twenty-two, Game Systems did not point out any evidence that Houchin was interested in any transaction of Game Systems.  Thus, the burden never shifted to Houchin to prove that he did not benefit from any such transaction or that Game Systems was not harmed by it.  Game Systems did not make any other argument in its response and pointed to no evidence about whether Houchin breached his fiduciary duty in any way other than benefitting from a transaction with Game Systems.

In its brief on appeal, Game Systems states that "there is evidence raising a fact issue as to whether Appellees breached fiduciary duties" to Game

---

[32] *See* Tex. R. Civ. P. 166a(i).

[33] *See id.*

18

Systems. Our inquiry does not focus on whether evidence *exists* to support Game Systems claim; instead, we look to see if Game Systems produced that evidence and pointed it out to the trial court in response to the no-evidence motion.[34] Because Game Systems did not, the trial court did not err by granting summary judgment for Houchin on Game Systems's breach of fiduciary duty claim against him. We overrule Game Systems's second issue.

## B. Game Systems's Fraud Claims

Game Systems's third, fourth, and fifth issues relate to Game Systems's fraud claims. In its fourth issue, Game Systems asserts that the trial court erred by granting summary judgment for Appellees on its fraud by misrepresentation claim.

In their no-evidence summary judgment motions, Houchin, Tronics, and Leasing asserted that Game Systems had no evidence that they (1) made a material representation to Game Systems, (2) which was false; (3) which they knew was false or that was made recklessly as a positive assertion without knowledge of its truth; (4) which was intended to be relied upon; (5) which Game Systems did rely upon; (6) and which caused Game Systems injury.

In its response to Tronics and Leasing's motion, Game Systems pointed out evidence that it contended raised a fact issue on each challenged element, although it did not specify which evidence related to which element. Game

---

[34]*See* Tex. R. Civ. P. 166a(i) & cmt.

Systems directed the trial court's attention to the two versions of the letter of intent, LRA1, LRA2, and the equipment lease. Game Systems also pointed out the following statements in the affidavit of Weaver:

> An altered Letter of Intent was attached to [Tronics] and [Leasing's] Original Petition. . . . That altered Letter of Intent attempts to include the terms of paragraph (7) with the schedule B license payments. Significantly, without this addition, [Tronics] cannot support its claims in this lawsuit.
>
> . . .
>
> On December 6, 2004, I received a fax of [LRA2]. [LRA2] is identical to [LRA1] aside from the inclusion of Game Systems as the "borrower" under rather than [Tronics] and the fact that it was signed by Houchin as president of Game Systems as well as Milan on behalf of [Financial] and Di Carlo on behalf of [Tronics]. I was aware of the fact that [Tronics] had obtained money from [Financial], but was never informed that Game Systems was made a borrower in any agreement with [Financial]. Houchin dealt with [Financial] while he was president of Game Systems.
>
> . . .
>
> On December 6, 2004, I was faxed a copy of a document headed "Equipment Lease (Ontario)" . . . which states that it is "made effective" July 19, 2004. This is the first time I heard of the Equipment Lease. This document is signed by Houchin, allegedly for Game Systems, with an entity listed as [Leasing] (an entity no one at Game Systems had ever heard of).
>
> . . .
>
> The Equipment Lease contains many mis-statements, one of which is that [Leasing] owned Game Systems'[s] products and that [Leasing] provided equipment to Game Systems. No equipment was ever provided under the "lease" by [Leasing] to Game Systems.
>
> . . .

This lease agreement was no more than fiction; although the Equipment Lease purportedly gave [Leasing] ownership of the 2[,]000 Hello Money Sweepstakes Validation Terminals, Game Systems always owned and manufactured its own equipment and never leased any equipment from any person or entity. In fact, the lawyer who prepared the incorporation documents for [Leasing] testified that the only purpose for the corporation was to hold a bogus UCC-1 form in order that some person or entity could ostensibly show a greater interest in the Hello-Money equipment.

Game Systems used the same evidence in response to Houchin's motion, plus one additional paragraph from Weaver's affidavit: "Houchin fabricated production schedules. These production schedules showed that many more Hello Money consoles had been produced than were actually in existence." Game Systems also attached the production schedules referenced in this paragraph as evidence of fraud by Houchin.

Neither Weaver's affidavit nor the documents referenced in the affidavit show a false representation on which Game Systems relied to its detriment.[35] Game Systems pointed out instruments allegedly executed by Houchin acting *for* Game Systems, but it did not point out evidence that Houchin intended Game Systems to rely on the instruments or that it did rely on them. Game Systems did not point out any evidence that Houchin made any false representations *to* Game Systems on which Game Systems relied. Even reading Weaver's affidavit

---

[35] *See Priddy v. Rawson*, 282 S.W.3d 588, 598 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (noting that the appellants, in their response to the appellee's no-evidence summary judgment motion on their fraud claim, had not identified any misrepresentations by the appellee, and stating that the court had no duty to perform an independent review of the record for evidence supporting the appellants' position).

21

liberally to include an accusation that some of the instruments were executed after Houchin left the company, Game Systems pointed out no evidence that it relied to its detriment on any statements in those instruments.

As for Tronics and Leasing, the evidence noted by Game Systems did not include any false representation by either party on which Game Systems relied to its detriment. That two different versions of the letter of intent and two different versions of the loan royalty agreements were in existence does raise questions about whether Appellees were remarkably careless in drafting business documents (one can hardly argue, for example, that the identity of the borrower in a $3,000,000 loan transaction is a trivial detail) or whether they were engaged in some dishonest activity. But without more, these documents do no more than create surmise or suspicion,[36] and, importantly, they do not show that Game Systems relied on them to its detriment. Houchin, then acting for Game Systems, signed each instrument, and Game Systems pointed out no evidence that Houchin relied on any misrepresentation by Tronics or Leasing in agreeing to execute the instruments. Game Systems pointed out no evidence that any one else acting for Game Systems was induced to take any action or to refrain from taking any action because of representations by Houchin, Tronics, or Leasing.

---

[36] *See King Ranch, Inc.*, 118 S.W.3d at 755 (holding that the plaintiffs' evidence on their extrinsic fraud claims really consisted of no more than theories and suspicions and could not defeat a no-evidence summary judgment motion).

22

Game Systems argues that the evidence raises a fact issue as to whether Houchin misrepresented the nature and purpose of the money from the loan agreements because Weaver and Olmstead both testified that Houchin represented to them that the money received from Tronics was from a third party investor whom Tronics was liable for repaying. But Game Systems did not note any evidence of its alleged detrimental reliance on such statements by Houchin. And furthermore, Olmstead's testimony was not pointed out to the trial court in response to Appellees' no-evidence motion; only Weaver's testimony was. The only relevant statements in Weaver's affidavit noted by Game Systems are that Weaver "was aware of the fact that [Tronics] had obtained money from [Financial], but was never informed that Game Systems was made a borrower in any agreement with [Financial]. Houchin dealt with [Financial] while he was president of Game Systems." This is not an assertion that Houchin affirmatively told Game Systems that the money came from Tronics rather than Financial, and while it is some evidence of a failure by Houchin to disclose LRA2 to Weaver, it is not evidence that Game Systems relied to its detriment on Houchin's failure to disclose to Weaver the existence of LRA2.

Game Systems also argues that it raised a fact issue about whether Houchin misrepresented the number of Hello Money terminals in existence and the amount that should be paid to Tronics under the letter of intent. It contends that Houchin created false production schedules to justify paying unearned royalty payments to Tronics. The only evidence noted by Game Systems in its

23

response relating to the production schedules is a statement in Weaver's affidavit that "Houchin fabricated production schedules" and a copy of the production schedules. Game Systems pointed out no evidence that Game Systems relied on any false production schedules to its detriment.

Finally, Game Systems argues that a fact issue exists as to whether Di Carlo misrepresented the quality of the software that Tronics could and did deliver to Game Systems. But it pointed out no evidence of such a fact in its response to Tronics's no-evidence motion. Accordingly, we overrule Game Systems's fourth issue.

In its fifth issue, Game Systems argues that the trial court erred by granting summary judgment on all of its fraud claims when Appellees failed to challenge all of its fraud theories. Game Systems asserts that fraud embraces "all means resorted to by one individual to gain an advantage over another by false suggestions or suppression of truth, including all surprise, tricks, cunning, dissembling and unfair way by which another is cheated."[37] It asserts that its petition alleged types of conduct involving fraud by non-disclosure or fraud committed through some form of artifice, trickery, cunning, and dissembling. And, Game Systems argues, because Appellees "restricted their no[-]evidence motions to challenging [Game Systems's] claims based on fraud by

---

[37]*See McEwin v. Allstate Tex. Lloyds*, 118 S.W.3d 811, 816 (Tex. App.—Amarillo 2003, no pet.) (stating that "not all fraud is comprehended within elements of the traditional test" and that "[t]he gist of fraud is successfully using cunning, deception or artifice to cheat another to the other's injury").

24

misrepresentation," Appellees failed to move for summary judgment on all of Game Systems's fraud claims.

We agree that "[t]he gist of fraud is successfully using cunning, deception, or artifice to cheat another to the other's injury."[38]  But to prevail on a common law fraud claim, the plaintiff must prove that the defendant intentionally misled or deceived the plaintiff, either by making a false misrepresentation or by failing to disclose what the defendant had a duty to disclose, and that the plaintiff relied on the misrepresentation or nondisclosure.[39]  Appellees challenged these elements in their no-evidence summary judgment motions.  Game Systems therefore had a duty to produce some evidence in support of these elements, and we have held that it failed to point out evidence that it relied on any act of deceit by Appellees. Accordingly, we overrule Game Systems's fifth issue.

In its third issue, Game Systems argues that the trial court erred by refusing to grant it summary judgment on its breach of fiduciary duty claims against Appellees.  Because we have held that the trial court did not err by

---

[38]*W. Reserve Life Assurance Co. of Ohio v. Graben*, 233 S.W.3d 360, 376 (Tex. App.—Fort Worth 2007, no pet.).

[39]*See, e.g.*, *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 922–23 (Tex. 2010) (stating that fraud requires the plaintiff to show an intent to deceive and actual and justifiable reliance); *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997) (noting that reliance is an element of fraud by non-disclosure, a subcategory of fraud "because, where a party has a duty to disclose, the non-disclosure may be as misleading as a positive misrepresentation of facts").

granting no-evidence summary judgment for Appellees on Game Systems's breach of fiduciary duty claims, we overrule this issue.

## C. Leasing's Breach of Contract Claim Based on LRA2

In its sixth issue, Game Systems asserts that the trial court erred by granting summary judgment on Leasing's claim that Game Systems breached LRA2 because (1) a fact issue exists as to whether LRA2 is a product of Appellees' fraud, (2) Leasing did not establish its right to judgment as a matter of law, and (3) Leasing lacks standing to recover for breach of LRA2.

Game Systems first argues that a fact issue exists as to whether LRA2 is a product of Appellees' fraud. More specifically, it argues that there is a fact issue as to Houchin's breach of duty and fraud and whether Tronics, Financial, and Leasing colluded with Houchin to defraud Game Systems. We have overruled Game Systems's issue with respect to its fraud claim, and we therefore reject Game Systems's argument that an issue of fact as to fraud precluded summary judgment for Leasing on its breach of contract claim.

Game Systems also argues that Leasing did not conclusively establish its right to judgment as a matter of law because the evidence Leasing relies upon is taken out of context, does not support Leasing's position, and has to be disregarded because it conflicts with Olmstead's and Weaver's testimony that Game Systems did not know of LRA2's existence until after Houchin had resigned. Game Systems contends that Olmstead's testimony that Game Systems owed Tronics $1.95 million was based on Olmstead's "understanding

that [Game Systems] owed the money to Tronics pursuant to specific terms, which he could not remember at the time, that Houchin struck with Tronics." Game Systems argues that Olmstead's testimony "does not conclusively establish as a matter of law that [LRA2] is a valid and enforceable contract"; rather, "Olmstead repeatedly testified that [Game Systems] did not know about the execution" of LRA2 until after Houchin's resignation and that Game Systems "believed that [LRA2] was a sham transaction."

The elements of a breach of contract claim (which Leasing did not state in its summary judgment motion) are "(1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) resulting damages to the plaintiff."[40] To be entitled to summary judgment on this claim, Leasing was required to submit evidence establishing a prima facie case on each of these elements.

In its motion for summary judgment, Leasing stated that Financial advanced to Game Systems a sum of "at least $2,260,847.87" but that Game Systems failed to make payments to Financial as required under LRA2 and the equipment lease. Leasing referred the court to pages from a deposition given by Olmstead in a bankruptcy proceeding; Leasing claimed that in this deposition, Olmstead admitted that Game Systems owed the money. Leasing asserted that

---

[40]*Fieldtech Avionics & Instruments, Inc. v. Component Control.Com, Inc.*, 262 S.W.3d 813, 825 (Tex. App.—Fort Worth 2008, no pet.) (citing *Harris v. Am. Prot. Ins. Co.*, 158 S.W.3d 614, 622–23 (Tex. App.—Fort Worth 2005, no pet.)).

27

it had repossessed 170 of the terminals, which had a fair market value "on [sic] not more than $1,500.00 per machine that was the acquisition cost of the equipment," and it referred the court to LRA2, the deposition of Richard Graham, and an order in the Alabama case. Leasing then stated that

> [t]he summary judgment evidence establishes, as a matter of law that [Game Systems] has did not [sic] make the payments to Forbes Hutton as required by the parties['] agreement. [Game Systems] has admitted in the testimony of its Corporate Representative Mark Olmstead that the sum of $1,953,745.00 remains unpaid on the principal advanced to it under [LRA2]. [Game Systems] admits it received the funds and accepted the benefits of their use. [Tronics] stipulates that [Tronics] was acting on behalf of Forbes in forwarding the funds in question to [Game Systems]. The summary judgment evidence establishes that the 170 terminals, which Forbes was able to repossess in Alabama, had a value not to exceed $1,500.00 per machine (their original acquisition cost). Accordingly, applying a credit to [Game Systems] of $255,000 for the recovered machines leaves an unpaid outstanding princip[al] balance of $1,728,745.00.

Thus, with respect to showing the existence of a valid contract, Leasing relied on LRA2, which Leasing attached to its motion. To show performance, breach, and damages, Leasing relied on Olmstead's deposition, attached to the motion, in which he testified that Game Systems had received money, purportedly under a loan agreement, and that $1,953,745 of the advanced money had not been repaid. But in his testimony, Olmstead only testified that Game Systems had received money from Tronics, not from Financial or from Leasing. Olmstead specifically stated that "[a]s far as we are concerned, our agreement was with [Tronics]" and "[t]hat's where we got the money from." Nowhere in his testimony did Olmstead admit or suggest that Game Systems

28

had received money directly from Financial. Olmstead stated that if Tronics wanted Game Systems to pay the money to Financial instead of directly to Tronics, it would, and he stated that if he were shown documents showing that "Forbes Hutton" had given the money for the loan to Tronics, "[i]t would obviously show where [Tronics] got that money from." But he never testified that Game Systems received any money from Leasing under LRA2.[41] Without some other evidence to show that Financial tendered money to Game Systems under LRA2 and that it suffered damages resulting from Game Systems's failure to repay the money, Leasing was not entitled to summary judgment on its claim that Game Systems breached LRA2.[42]

After filing its summary judgment motion, Leasing supplemented its motion with additional evidence in the form of an assignment from Financial to Leasing of its breach of contract cause of action. This assignment was executed after Leasing had filed suit against Game Systems. In this assignment, executed by Roque Isla (president of Financial) on behalf of both Financial and Leasing, Isla stated that Financial had advanced $2,268,847.37 to Game Systems and that

---

[41]The record also includes testimony from Houchin at the temporary injunction hearing, produced by Game Systems in response to Houchin's summary judgment motion, that Di Carlo dispersed the funds to Game Systems (and at some point began deducting $18,500 from the amount dispersed weekly "as an advance against his royalty payments"), which supports Game Systems's contention that it obtained funding from Tronics, not Financial.

[42]*See Fieldtech Avionics*, 262 S.W.3d at 825 (stating the elements of a breach of contract claim); *see also* Tex. R. Civ. P. 166a.

this money had not been repaid.  This statement, made by an interested party and contradicted by Olmstead's testimony, does no more than raise a fact issue.[43]

Leasing also attached a document purporting to be a "payment detail" from Game Systems, which includes a payment to "Forbes Hutton Financial Corp." But the memo line of that entry states, "Notes Payable–Gametronics."  Thus, this entry is as consistent with Olmstead's suggestion that Gametronics obtained the money it loaned to Game Systems from Financial (and Financial's inquiries during the bankruptcy proceeding about whether Game Systems would be willing to repay the loan money to Financial rather than Tronics) as it is with Financial's assertion that it advanced money to Game Systems directly under LRA2.

Because Leasing failed to submit sufficient evidence to establish all essential elements of its breach of contract claim, the trial court erred by granting summary judgment for Leasing on the claim.[44]  We therefore sustain this part of Game Systems's sixth issue.

Finally, in the remainder of its sixth issue, Game Systems argues that the summary judgment for Leasing must be reversed because Leasing lacks

---

[43]*See Melody v. Tex. Soc'y of Prof'l Eng'rs*, 421 S.W.2d 693, 695–96 (Tex. Civ. App.—Dallas 1967, no writ) (noting that generally, statements of an interested witness do no more than raise a fact issue, although such statements may be taken as true when the statements are, among other things, uncontradicted by the opposite party who had the means to disprove them if they were false).

[44]*See* Tex. R. Civ. P. 166a(a), (c); *MMP, Ltd.*, 710 S.W.2d at 60.

standing to recover for breach of contract based on LRA2. Leasing's supplemental evidence includes the assignment by Financial to Leasing and a business records affidavit by Isla. Game Systems objected to the affidavit on the ground that "there is no statement that all of the facts stated in such affidavit are true." The trial court sustained this objection. Game Systems also objected to the assignment as hearsay. The trial court overruled this objection. The trial court clearly considered the assignment as summary judgment evidence, noting in the judgment that Financial had assigned its claim to Leasing.

Game Systems asserts that there was no evidence to prove that Leasing had standing after the trial court sustained Game Systems's objection to the Isla affidavit because that ruling eliminated the only witness to sponsor and authenticate the assignment. Game Systems further asserts that the trial court should have sustained Game Systems's objection to the assignment on hearsay grounds.

Leasing contends that any error in admitting the document while sustaining the objection was harmless because the document was admissible. The assignment is a written statement, other than one made by a declarant while testifying at the hearing, offered into evidence to prove the truth of the matter asserted (namely, that Financial assigned its rights under LRA2 to Leasing). As

31

such, the assignment is hearsay.[45]  The assignment is admissible, however, under the business records exception.[46]

Although the affiant of a business records affidavit must swear to the contents of the affidavit, the form of affidavit provided in the rules does not require an express statement in a business records affidavit that all of the facts stated in the affidavit are true.[47]  The affiant is required to aver that the record attached to the affidavit is kept in the regular course of business, that it was the regular course of business for an employee or representative of the company with knowledge of the act recorded to make the record, and that the record was made at or near the time of the act or reasonably soon after.[48]  The affiant must state that he is "personally acquainted with the facts herein stated."[49]  The affiant must also swear that the attached record is the original or an exact duplicate.[50]

In this case, Isla stated his name and his position with Financial.  He stated that the assignment attached to the affidavit is "a true and correct copy" of the assignment, that he personally executed the document, and that its execution

---

[45]Tex. R. Evid. 801(d).

[46]*See* Tex. R. Evid. 803(6).

[47]Tex. R. Evid. 902(10)(b).

[48]*Id.*

[49]*Id.*

[50]*Id.*

was authorized by the directors and shareholders of Financial. He further swore that the original of the assignment is maintained at the company's offices "in the regular course of its business and it was the regular course of business for an employee or representative of [Financial], with knowledge of the act, event, condition recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter." Isla swore to the contents of the affidavit before a notary public, as required by rules of evidence.[51] Isla did not expressly state that he was personally acquainted with the facts stated in the affidavit, but he does state that he personally executed the assignment as president of Financial, thereby demonstrating his personal knowledge. Because the affidavit meets the requirements of Rule 902(10), the assignment is admissible under the hearsay exception in rule 803(6). The trial court should have overruled Game Systems's objection to the affidavit, and it had the authority to do so even after it had originally sustained it.[52] The trial court therefore did not abuse its discretion by considering the assignment. We overrule the remainder of Game Systems's sixth issue.

---

[51]Tex. R. Evid. 803(6), 902(10).

[52]*See Hunte v. Hinkley*, 731 S.W.2d 570, 571 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.) (noting that "[a] trial court has authority to reconsider its own rulings as long as it retains jurisdiction").

**D. Tronics's Claim of Termination of the Licensing Agreement**

Tronics sued Game Systems for declaratory relief, arguing that "[t]he summary judgment evidence establishes as a matter of law that [Game Systems's] license to use the [Tronics] software has terminated" and seeking a declaration to that effect. In Game Systems's seventh issue, it argues that the trial court erred by granting summary judgment for Tronics on this claim.

The letter of intent provides that Game Systems would pay Tronics "a fee for the license of the technology and related customized work . . . in the amount of US$315,000 'License Fee' as per schedule 'B.'" Two different versions of Schedule B appear in the record, one provided by Tronics in support of its motion, and one provided by Game Systems in its response. Both versions list four installment payments of $78,750. The version produced by Tronics ("Version I") also lists on Schedule B "*fees re: #7 above"; paragraph seven of the body of the letter of intent provides for payments by Game Systems of a percentage of "the win" of each machine. Thus, under Version I, the revenue percentage payments constitute part of the license fee.

The version produced by Game Systems ("Version II") requires Game Systems to pay Tronics the four installment payments as a license fee but does not list the "*fees re: #7 above" as part of the license fee. Neither version of the letter of intent references the other or asserts that it replaces the other. Both versions of Schedule B bear the initials of Houchin and Di Carlo. No other initials or signatures appear on Schedule B.

Both versions of the letter of intent expressly provide Tronics with the right to terminate the contract under two circumstances: Game Systems's insolvency or bankruptcy, or Game Systems's failure to pay the license fee required under the agreement. Tronics did not, however, base its termination of the agreement solely on this provision. Tronics stated in its summary judgment motion that it had terminated Game Systems's license on March 30, 2005, because Game Systems "failed entirely or in substantial part to comply with its obligations" under the letter of intent in that it "failed to pay license fees and other consideration," failed to provide Tronics with real-time access to management and operational information, failed to provide monthly reports, "failed to pay that portion of licensing fees comprised of winnings from each [t]erminal," and failed to operate Tronics's software in accordance with the law and in a professional manner that did not have negative effects on Tronics's operations and licenses. Tronics then asked the trial court to enter a declaratory judgment that it had effectively terminated the license.

The trial court granted summary judgment for Tronics declaring that the license was terminated without specifying the grounds asserted by Tronics on which it had based its decision. Game Systems was therefore required to argue on appeal that the trial court could not have properly granted summary judgment on any of the grounds asserted by Tronics.[53]

---

[53]*See Malooly Bros., Inc.*, 461 S.W.2d at 121 (holding that summary judgment must stand since it may have been based on a ground not specifically

Game Systems focuses its argument on the termination provision of the contract, asserting that the contract only allowed for termination on the happening of one of the two specified contingencies: (1) its own insolvency or bankruptcy or (2) its failure to pay the license fee. Game Systems argues that it was never adjudicated bankrupt and Tronics did not establish that it was insolvent, and, therefore, Tronics could not have terminated the contract under the first contingency. Game Systems further argues that Tronics could not have terminated the contract on the second contingency because a fact issue exists as to whether Game Systems paid the license fee.

Game Systems argues that because a fact issue exists as to whether the revenue percentage payments were part of the license fee, a fact issue also exists as to whether Game Systems paid the license fee, and summary judgment was therefore improper. We agree that a fact issue exists as to which version of Schedule B is part of the final, executed contract. But although only one version of the letter of intent expressly characterizes the revenue percentage payments as a part of the license fee, both versions require Game Systems to make the payments. Game Systems does not dispute that it did not pay the revenue percentage payments, that it did not provide monthly reports, or that it disconnected the terminals from the servers and thereby failed to provide real

challenged on appeal); *Shelton v. Sargent*, 144 S.W.3d 113, 129 (Tex. App.—Fort Worth 2004, pet. denied) (affirming summary judgment on unchallenged ground).

36

time information to Tronics. Game Systems merely argues that because the letter of intent does not provide that Tronics could terminate the agreement for its failure to follow these contract provisions, Tronics could not have terminated the contract.

But the letter of intent did not provide that Tronics could terminate the license agreement *only* under the two specified contingencies.[54] Unless the contract provided otherwise, which it does not, under well-established principles of contract law, Tronics could terminate the contract for any material breach of the agreement by Game Systems.[55]

---

[54] *See, e.g., Navistar Int'l Transp. Corp. v. Crim Truck & Tractor Co.*, 883 S.W.2d 687, 688 (Tex. App.—Texarkana 1994, writ denied) (noting that the franchise agreement between the parties provided that the appellant could unilaterally terminate the franchise *only* if the appellee breached certain conditions); *Hansson v. Time Warner Entm't Advance*, 03-01-00578-CV, 2002 WL 437297, at *1 (Tex. App.—Austin Mar. 21, 2002, pet. denied) (not designated for publication) (construing an employment contract providing that the employee could terminate her employment *only* under certain conditions); *Union Natural Gas Co. v. Enron Gas Mktg., Inc.*, 14-98-00183-CV, 2000 WL 350546, at *4 (Tex. App.—Houston [14th Dist.] Apr. 6, 2000, no pet.) (not designated for publication) (discussing language in a contract providing that the contract "shall not be terminated" except in circumstances specified in the contract); *Alphagraphics Franchising, Inc. v. Babbitt*, 01-88-00101-CV, 1989 WL 2427, at *1 (Tex. App.—Houston [1st Dist.] Jan. 18, 1989, no writ) (not designated for publication) (noting that the parties' franchise agreement provided that franchisee's license would terminate "[i]f, and only if" certain conditions occurred).

[55] *Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 196 (Tex. 2004) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.").

Game Systems makes no argument that the breaches alleged by Tronics were not material. And the revenue percentage payments, even if not part of the license fee, are at the heart of the letter of intent; monetary compensation is the only benefit that Tronics receives under the letter of intent.[56] The trial court may have reached its decision by considering the summary judgment evidence regarding the intention of the parties and concluding that Game Systems's failure to make the payments was a material breach and that Tronics was therefore entitled to terminate the contract. Game Systems does not argue that the trial court's conclusion regarding materiality was erroneous. Accordingly, we cannot say that the trial court erred by granting summary judgment for Tronics on this ground.

Game Systems also argues that the trial court erred by granting summary judgment on Tronics's claim because there is a fact issue as to whether the letter of intent was the product of Tronics's fraud. Because we have held that the trial court did not err by granting summary judgment for Tronics on Game Systems's fraud claim, we overrule this argument.

---

[56] *See Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994) ("In determining the materiality of a breach, courts will consider, among other things, the extent to which the nonbreaching party will be deprived of the benefit that it could have reasonably anticipated from full performance."); *see also Mustang Pipeline Co.*, 134 S.W.3d at 200 (holding as a matter of law, based on the evidence and the contract's language, that the appellee's breach of the contract was material).

Finally under this issue, Game Systems argues that the trial court erred by granting summary judgment because a fact issue exists as to whether Game Systems has an ownership interest in Tronics's software. Tronics asserted in its summary judgment motion that the evidenced establishes as a matter of law that the letter of intent does not transfer any ownership of the software to Game Systems. In response, Game Systems asserted that the software was defective and that it had had to spend money to fix the defects, and, therefore, "Game Systems has an ownership interest in software that [Tronics] provided to the extent that Game Systems has had to create new games from the [Tronics] software as a result of [Tronics's] failure to provide or repair software it provided."

But the only evidence Game Systems produced to this effect are the conclusory statements[57] in Weaver's affidavit that "Game Systems has had to spend, and is continuing to spend, hundreds of thousands of dollars fixing the broken software" and that a dispute arose among the parties when it "became apparent that the [Tronics] software was defective, that [Tronics] was not going to support the software, [and] that hundreds of thousands of dollars in expenses were going to be incurred by Game Systems as a result." These statements do not raise a fact issue about whether the letter of intent gives Game Systems an ownership interest in the software.

---

[57] *See Souder v. Cannon*, 235 S.W.3d 841, 849 (Tex. App.—Fort Worth 2007, no pet.) ("A conclusory statement is one that does not provide the underlying facts to support the conclusion.").

On appeal, Game Systems argues that a fact issue exists as to whether Game Systems has an ownership interest in the software because Tronics granted Game Systems a license to use the software and in return, Game Systems paid a license fee. Game Systems argues that it therefore had a right to use the software indefinitely unless some specific provision in the letter of intent allowed Tronics to terminate the license.

Game Systems did not make this argument in the trial court. On appeal from the grant of a summary judgment, the nonmovant may raise the issue of legal sufficiency for the first time on appeal, but any other issue must have been raised in the trial court in order to serve as a basis for reversal on appeal.[58] Furthermore, *Lulirama Ltd.*, the case relied on by Game Systems in support of its argument that the license gives Game Systems an ownership interest in the software, does not support this claim.[59]

That case does not hold that merely paying a license fee gives the licensee an ownership interest in the licensed work. Rather, it notes that under the federal Copyright Act, an exclusive license can transfer copyright ownership.[60] Nothing in the letter of intent suggests, much less establishes, that

---

[58]*See* Tex. R. Civ. P. 166a(c); *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993).

[59]*Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872, 874 (5th Cir. 1997).

[60]*Id.* at 879.

40

the license granted was an exclusive license. Game Systems also cites *Lulirama Ltd.* for the proposition that if the license was a nonexclusive license, it gave Game Systems the right to use the software indefinitely unless some specific provision in the agreement allowed Tronics to terminate the license. The case actually holds, however, that a nonexclusive license may be irrevocable if supported by consideration *because such license is a contract.*[61] In other words, because such a license supported by consideration constitutes a contract, the license is not terminable at will.[62] But that case did not hold that such a contract may never be terminated except as provided in a termination provision in the contract or that it is not subject to fundamental principles of contract law.[63] The court in that case expressly did not reach the issue of who owned the licensed property.[64] Accordingly, we are unpersuaded by Game Systems's argument. We overrule Game Systems's seventh issue.

---

[61]*Id.* at 882.

[62]*Id.* at 883.

[63]*See Johnson v. Jones*, 885 F. Supp. 1008, 1014 (E.D. Mich. 1995) (noting that "[t]ypically, federal courts apply the relevant state law in determining questions of contract").

[64]*Lulirama Ltd.*, 128 F.3d at 883.

**E. Game Systems's Tortious Interference with Contract Claims**

Game Systems argues in its eighth issue that the trial court erred by granting summary judgment on its tortious interference with contract claims against Appellees.

Appellees asserted in their no-evidence motions that there was no evidence that Game Systems had a valid contract, that they willfully and intentionally interfered with the contract; that the interference was a proximate cause of Game Systems's injury; or that Game Systems incurred actual damage or loss. In response to Tronics and Leasing's motion, Game Systems relied on copies of the cease and desist letters sent by Leasing and Tronics to Seven Sky and other entities, and a letter naming Houchin as an agent of Leasing for purposes of repossessing equipment in Texas. Game Systems also pointed out excerpts from Weaver's affidavit stating that after a dispute arose between Game Systems and Tronics over the software, "persons purporting to be associated with [Leasing] and [Tronics] began demanding, based on the Equipment Lease, that the distributors of Game Systems . . . turn over both the machines and all funds owed to Game Systems directly to [Appellees]" and that "[Appellees] began . . . demanding that such third parties turn off the machines in violation of their agreements with Game Systems" on the ground that the software license had been terminated. Game Systems further pointed out as evidence this paragraph in Weaver's affidavit:

On February 18, 2005, Game Systems had entered into a distributorship agreement with Seven Sky, Inc., an Alabama Corporation . . . In March of 2005 when [Appellees] were sending their Cease and Desist Letters, [Appellees] caused Seven Sky, Inc. to begin paying [Tronics] and/or [Leasing] the percentage of income set out in Exhibit A-17 and has made no payment to Game Systems since that time. I believe that [Tronics] and/or Forbes Hutton began receiving these payments. Interestingly, Houchin was named by [Leasing] as its 'agent of [Leasing] for the limited purpose of repossessing the Hello Money Sweepstakes terminals covered by the lease agreement between [Leasing] and [Game Systems].

The evidence relied upon by Game Systems is not enough to raise a fact issue sufficient to defeat summary judgment. The letter naming Houchin as agent is not evidence of any of the elements of tortious interference, given that he was only appointed as agent in Texas, that there was no evidence that Game Systems suffered any damages due to action Houchin took as an agent in Texas, and that there was no evidence that he actually repossessed anything. Likewise, Weaver's statement of his belief about to whom Seven Sky made payments is no evidence because it is conclusory; the affidavit does not demonstrate that Weaver has any personal knowledge of whether the payments were sent to Appellees or to anyone else.

Game Systems did offer evidence (1) of the existence of a contract with Seven Sky, (2) that Leasing and Tronics sent letters to Seven Sky instructing it to stop paying Game Systems, and (3) that Game Systems thereafter did not receive any payments under the contract. But Game Systems did not produce evidence that Appellees' actions caused it to suffer any damages. Richard Graham, a representative for Seven Sky, testified by deposition in the bankruptcy

43

proceeding that in addition to the cease and desist letters, a primary reason he stopped doing business with Game Systems was that Game Systems set up competing locations in Alabama. Game Systems presented no evidence that, had the terminals not been repossessed, Seven Sky would have continued to operate them. And importantly, the agreement with Seven Sky stated that Game Systems was to be compensated with a percentage of gross profits, but Game Systems produced no evidence that for the months it received no payments, Seven Sky generated any profits. Accordingly, Game Systems produced no evidence on damages.[65] The trial court therefore did not err by granting summary judgment for Tronics and Leasing on this claim.

In response to Houchin's summary judgment motion, Game Systems pointed out the same paragraph in Weaver's affidavit about the cease and desist letters and Seven Sky's stopping payment to Game Systems, as well as the letter naming Houchin as agent for Leasing to repossess Leasing's equipment. That Houchin was authorized by Leasing to repossess equipment in Texas is not enough to raise a fact issue as to whether Houchin interfered with a valid contract that Game Systems had with another party. The trial court properly

---

[65]*See Am. Nat'l Petrol. Co. v. Transcon. Gas Pipe Line Corp.*, 798 S.W.2d 274, 278 (Tex. 1990) (stating that "[t]he basic measure of actual damages for tortious interference with contract is . . . to put the plaintiff in the same economic position he would have been in had the contract interfered with been actually performed").

44

granted Houchin's no-evidence summary judgment motion on this claim. We overrule Game Systems's eighth issue.

## F. Game Systems's Conversion Claim

In its ninth issue, Game Systems asserts that the trial court erred by granting summary judgment on its conversion claim against Houchin, Tronics, and Leasing.

Appellees asserted in their summary judgment motions that there was no evidence that they wrongfully exercised dominion or control over Game Systems's personal property and no evidence that Game Systems suffered injury from any such act. In response to Tronics and Leasing's motion, Game Systems relied on the following evidence: copies of the cease and desist letters sent by Tronics and Leasing, the letter authorizing Houchin to repossess Leasing's equipment in Texas, and two paragraphs of Weaver's affidavit. The first paragraph is the same one Game Systems relied on in support of its tortious interference claim, alleging that the cease and desist letters caused Seven Sky to stop paying Game Systems and that Weaver "believe[d]" that the payments were sent to Tronics and "Forbes Hutton." The second paragraph contains the assertion that "[Tronics] took from Game Systems the source code for a separate computer program that was designed by Game Systems at a cost of well over $1 million, and which constitutes a trade secret of Game Systems. This was done without Game Systems'[s] consent or authorization."

The assertions in Weaver's affidavit that Tronics took Game Systems's source code are conclusory.[66] Weaver does not offer any facts showing a basis for knowledge that Tronics took Game Systems's source code. He does not state why he believes that Tronics took Game Systems's property; he does not describe what source code he refers to or how it came into Tronics's possession.

Furthermore, we have already discussed the paragraph respecting Weaver's assertions about Tronics and Leasing's interactions with Seven Sky and the cease and desist letters themselves. For the same reason that this evidence was not sufficient evidence to raise a fact issue about whether Game Systems suffered any damages with respect to its tortious interference claim, the evidence was also not sufficient to raise a fact issue about damages with respect to Game Systems's conversion claim against Tronics and Leasing. The trial court therefore did not err by granting summary judgment on Game Systems's conversion claim against Tronics and Leasing.

In response to Houchin's summary judgment motion, Game Systems directed the trial court to the following evidence: the patent application submitted on behalf of EMT by Houchin, a patent application submitted by Houchin individually, and a paragraph in Weaver's affidavit. In that paragraph, Weaver states that "during the night of October 31, 2004, Houchin and Canard stole the developmental . . . software for Hello Money and the Class II games. Although

---

[66]*See Souder*, 235 S.W.3d at 849.

46

one developmental server was returned to Game Systems, Game Systems was never given back any of the Class II developmental software." Weaver then 0states that "Houchin applied for the Hello Money software patent in his own name and caused that patent to be issued only to him in all contravention of his agreement with me [and] Olmstead."

With respect to Game Systems's claim that Houchin converted the Hello Money software, the trial court correctly granted summary judgment for Houchin. Game Systems did not offer evidence raising a fact issue on whether it owns the Hello Money software, and in fact, its response states (as does Weaver in his affidavit) that Game Systems was never intended to be the owner of the software. EMT was formed to be the holder of the proprietary rights to the Hello Money software, and its four owners, not Game Systems, were to apply for the patent on the software. Game Systems also did not introduce evidence that it had the right of possession of the software,[67] especially given the fact that Houchin was part owner of the company that allegedly owned or was intended to own the software. Game Systems pointed to no evidence that it had some sort of agreement with EMT that would entitle it to possession over an owner of EMT. Game Systems therefore failed to raise a fact issue as to whether Houchin

---

[67] *See Anchor Mortgage Servs., Inc. v. Poole*, 738 S.W.2d 68, 69 (Tex. App.—Fort Worth 1987, writ denied) ("It is essential that the plaintiff establish some interest in the property as of the time of the alleged conversion such as title or otherwise some right to possession.").

wrongfully exercised dominion or control over property belonging to Game Systems.

Furthermore, Game Systems pointed to no evidence that Hello Money had any value at the time of the alleged conversion. Nor did Game Systems indicate any evidence of the Class II software's value. Game Systems did not seek the return of this software; it only sought compensation for the software's loss. But although Weaver included a statement in his affidavit that Game Systems had paid "hundreds of thousands of dollars" developing the Hello Money and Class II software, Game Systems failed to point out any evidence of the actual value of either software at the time of conversion.[68] Game Systems therefore failed to point out any evidence that it incurred damages. Accordingly, the trial court correctly granted summary judgment for Houchin on Game Systems's conversion claim. We overrule Game Systems's ninth issue.

## G. Game Systems's Breach of Contract Claim

Game Systems argues in its tenth issue that the trial court erred by granting no-evidence summary judgment on Game Systems's breach of contract

---

[68]*See Prewitt v. Branham*, 643 S.W.2d 122, 123 (Tex. 1982) (stating that absent pleading or proof that converted property was of fluctuating value, the measure of damages is the value of the property at the time and place of conversion); *see also United Mobile Networks, L.P. v. Deaton*, 939 S.W.2d 146, 147–48 (Tex. 1997) (stating that generally the measure of damages for conversion is the fair market value of the property at the time and place of conversion).

claim against Tronics because Game Systems produced evidence raising a fact issue as to each of the challenged elements.

In Tronics's motion, it asserted that there was no evidence (1) that Game Systems performed, tendered performance of, or was excused from performing its contractual obligations; (2) that Tronics breached the contract; or (3) that Tronics's breach caused injury to Game Systems.

In its response to the motion in the trial court, Game Systems relied on a copy of "the original letter of intent," plus the following excerpts from Weaver's affidavit:

> [Tronics] never supplied a finite game to Game Systems. All of the games supplied were the Texas Zero games which were supposedly for testing purposes and which ran off of random number generators.
>
> . . . [T]his non-finite software was found to have serious defects. [Tronics] failed to support and maintain the software. As a result, Game Systems has had to spend, and is continuing to spend, hundreds of thousands of dollars fixing the broken software, which is already in the field and cannot be withdrawn without even greater expense. Additionally, following execution of the Letter of Intent, performances and obligations varied from the Letter of Intent.

This evidence does not raise a fact issue as to whether Game Systems suffered any injury as a result of a breach of the letter of intent by Tronics. The statement that "following execution of the Letter of Intent, performances and obligations varied from the Letter of Intent" is conclusory and is no evidence. The statements that "[Tronics] failed to support and maintain the software" and that "Game Systems has had to spend, and is continuing to spend, hundreds of thousands of dollars fixing the broken software" are not evidence of injury

49

because the letter of intent is not clear as to which entity was responsible for supporting the software and fixing the unspecified defects, nor does other evidence provide clarification. The letter of intent states that Tronics would be responsible for support and maintenance, at its cost, "as per SMA (Support and Maintenance Agreement to be provided within 30 days)." The SMA is not referenced as part of the summary judgment evidence and does not appear to have been included with it, so there is no basis from which a court can determine whether the alleged, unspecified defects should have been remedied by Tronics. Weaver also asserts in his affidavit that Tronics failed to supply a finite game to Game Systems, but Game Systems did not point to any evidence that by this failure, Game Systems was injured. Accordingly, Game Systems failed to produce sufficient summary judgment evidence to raise a fact issue on its breach of contract claim. We overrule Game Systems's tenth issue.

## H. Game Systems's Usury Claim

In its eleventh issue, Game Systems asserts that the trial court erred by granting summary judgment on its usury claim against Tronics and Leasing because Game Systems produced evidence raising a fact issue as to each element of the claim. Game Systems contended at trial that "there was never a loan made," but it argued in the alternative that if such a loan had taken place, the loan agreements raised an issue of fact on the challenged elements.[69]

---

[69]Leasing also makes alternative claims with respect to the loan royalty agreements, claiming that Game Systems breached LRA2 by failing to repay a

50

To recover on a usury claim, a plaintiff must show "(1) a loan of money; (2) an absolute obligation to repay the principal; and (3) the exaction of a greater compensation than allowed by law for the use of the money by the borrower."[70] In their no-evidence summary judgment motion, Tronics and Leasing challenged each of these three elements.

On appeal, Game Systems points to evidence that it argues is sufficient for a reasonable juror to find that Financial contracted for interest that exceeded the maximum allowed by law, and, thus, the summary judgment should have been denied. But as for its claim against Tronics, although Game Systems contends that if it received outside funding, the money came from Tronics rather than Financial, it failed to produce sufficient evidence showing the terms of the loan. Neither LRA1 nor LRA2 supports a usury claim against Tronics because under their plain language, Tronics is a borrower, not the lender, and Game Systems did not direct the trial court to any evidence that it had borrowed money from Tronics on the same terms as provided in either of those agreements. Accordingly, the trial court correctly granted no-evidence summary judgment for Tronics on the usury claim. We overrule this issue as to Tronics.

---

loan but that the loan was not usurious because there was no absolute obligation to repay the loan.

[70]*First Bank v. Tony's Tortilla Factory, Inc.*, 877 S.W.2d 285, 287 (Tex. 1994).

Regarding its claim against Leasing, Game Systems argues that "[t]here can be no question as to whether" it produced evidence raising a fact issue as to the challenged elements. It points to the language of LRA2 as establishing the loan of money and the absolute obligation of Game Systems to repay the loan, and to the repayment schedule as evidence of a usurious rate of interest. LRA2 provides that Finanical will "lend" $3,000,000 to Game Systems under a non-revolving term loan, to be advanced in weekly amounts. LRA2 provides that "[t]his loan will not bear interest prior to default" and would bear interest at the rate of ten percent per year after default. But although LRA2 provides that the loan would not bear interest before default, it further provides that Game Systems would make monthly payments to Financial regardless of whether it was in default, and these payments, over the course of a year, added up to more than the principal advanced. Thus, although LRA2 states that the loan carries no interest, it does provide for the repayment of more than the amount advanced.

As noted by Game Systems, the maximum interest rate that could be charged for a commercial loan at the time of the effective date of LRA2 was eighteen percent per year.[71] Eighteen percent of $3,000,000 is $540,000. LRA2

---

[71]*See* Tex. Fin. Code Ann. § 303.008 (West 2004) (providing that the consumer credit commissioner shall set the quarterly ceiling and annualized ceiling for the calendar year); Tex Fin. Code Ann. § 303.009(a) (providing a ceiling of eighteen percent a year); *see also* Rate Bracket Adjustment & Market Competitive Rate Ceilings, Office of Consumer Credit Commissioner, at http://www.occc.state.tx.us/pages/int_rates/brack_ceil.htm#rate_ceil (last visited May 26, 2011) (setting the ceiling for the period May 2004 at eighteen percent).

required Game Systems to make payments over the year that totaled approximately $3,900,000, meaning that if the money advanced constituted a loan, Financial stood to earn approximately $900,000 in interest, an amount well over the statutory maximum.

Leasing argues that LRA2 could not be usurious because LRA2 only required Game Systems to pay "a percentage of revenues until the principal is repaid and thereafter a smaller percentage of revenues as a royalty." It contends that there was no absolute obligation to repay the principal and that if Game Systems had no revenue from the terminals, it had no obligation to pay anything. But LRA2 does require Game Systems to repay the loan, regardless of whether it had any revenue from the terminals. If Game Systems failed to perform any of its obligations or covenants under the agreement, under the terms of LRA2, the principal became immediately due and payable without further notice or demand. As one of its obligations, Game Systems was required to pay Financial twenty-five percent of its gross revenue from the Hello Money games. But the amount Game Systems had to pay every month was not in reality based on its actual revenues because LRA2 defined the term "gross revenue" as the amount from purchase of phone time less certain specified deductions, "but *not less than* the weekly amounts documented on the [attached Schedule II]."[72] [Emphasis added] In other words, Game Systems was required to pay Financial minimum

---

[72]We note that this "not less than" language does not appear in LRA1.

payments, over the course of one year, as set out in an attached schedule stating the amount of money to be paid, and these payments were required regardless of whether Game Systems earned any revenue. Thus, its payments to Financial were not contingent on it earning revenue from the games.

Game Systems's obligation to repay the principal was absolute, as was its requirement to continue making payments through a twelve-month period established by Schedule II of the agreement, even after the principal had been repaid. And if Game Systems did not make the minimum payments and failed to remedy its nonpayment within seven days of notice and demand from Financial, then the nonpayment of that minimum amount constituted an event of default, which would trigger Game Systems's obligation to immediately repay the entire principal. If Financial did in fact advance money to Game Systems under LRA2 (which is a fact issue), it did so in order to enable Game Systems to engage in a business venture. Because LRA2 provides that that the advance was made on the understanding that the advance and an added amount had to be returned, the advance constituted a loan.[73] And we hold that Game Systems has submitted sufficient evidence to defeat Leasing's no-evidence motion as to

---

[73]*See Johns v. Jaeb*, 518 S.W.2d 857, 859 (Tex. Civ. App.—Dallas 1974, no writ); *cf. Korth v. Tumlinson*, 73 S.W.2d 1048, 1049 (Tex. Civ. App.—San Antonio 1934, no writ) (finding agreement to advance funds in exchange for promise to pay one-third of net proceeds upon sale of parcel of land not usurious because terms of contract did not show that principal would be absolutely repayable and instead showed that if land was not sold, lender would receive nothing).

whether this loan was usurious. As the assignee of Financial's cause of action, Leasing was subject to any defenses to its claim that Game Systems could have asserted against Financial.[74] Thus, Leasing is subject to Game Systems's usury claim.

The trial court therefore erred by granting no-evidence summary judgment on Game Systems's usury claim against Leasing.[75] We sustain Game Systems's eleventh issue as to its claim against Leasing.

## I. Game Systems's Misappropriation of Trade Secrets Claim

In its twelfth issue, Game Systems argues that the trial court erred by granting summary judgment on its misappropriation of trade secrets claim against Houchin and Tronics because there is a fact issue on each element challenged in the no-evidence motions.

A trade secret is (1) a formula, pattern, device, or compilation of information (2) that is used in one's business and (3) that "presents an opportunity to obtain an advantage over competitors who do not know or use

---

[74]*Vogt v. Jones*, 396 S.W.2d 539, 540 (Tex. Civ. App.—Fort Worth 1965, no writ) (noting that an assignee's right against an obligor under a contract is subject to all defenses to the contract's enforcement, provided that such defenses are based on facts existing at the time of the assignment or on facts arising after the assignment but prior to the obligor's knowledge of the assignment).

[75]*See* Tex. R. Civ. P. 166a(i).

it."[76] To determine whether a trade secret exists, we consider six nonexclusive factors:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.[77]

A claim for misappropriation of trade secrets accrues when the trade secret is actually used.[78]

In both Houchin's and Tronics no-evidence motions, they asserted that there was no evidence (1) that Game Systems owned a trade secret; (2) that they used or disclosed the trade secret in violation of a confidential or contractual relationship with Game Systems after acquiring the trade secret by improper means or with notice that the disclosure was improper; or (3) that Game Systems suffered injury.

Game Systems's entire response to Houchin's motion is as follows:

---

[76]*Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996).

[77]*In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (quoting from Restatement of Torts § 757 cmt. B (1939), now moved to Restatement (Third) of Unfair Competition § 39 reporter's n. cmt. d (1995)).

[78]*Computer Assocs.*, 918 S.W.2d at 455.

To demonstrate that there is evidence raising an issue of fact on these elements, Game Systems refers the [trial court] to the following evidence:

    a.    Affidavit of [Weaver], attached as Exhibit A, Paragraph 20, in which Weaver testifies that "since November of 2004, Canard and his company [Hest Technologies], along with Houchin and other entities in which he is involved have used the Hello Money software and the Class II software that was stolen from Game Systems."

Game Systems similarly responded to Tronic's motion for no-evidence summary judgment with the following:

To demonstrate that there is evidence raising an issue of fact on these elements, Game Systems refers the [trial court] to the following evidence:

    a.    Affidavit of [Weaver], attached as Exhibit A, Paragraph 27, in which Weaver testifies that "[Tronics] took from Game Systems the source code for a separate computer program that was designed by Game Systems at a cost of well over $1 million, and which constitutes a trade secret of Game Systems. This was done without Game Systems's[s] consent or authorization."

The evidence to which Game Systems directed the trial court does not meet Game Systems's burden. Game Systems did not offer evidence raising a fact issue on whether it owns the Hello Money software, and in fact, its response states (as does Weaver in his affidavit) that Game Systems was never intended to be the owner of the software. EMT was formed to be the holder of the proprietary rights to the Hello Money software, and its four owners, not Game Systems, were to apply for the patent on the software. Furthermore, Weaver's affidavit is not sufficient evidence to raise a fact issue that either the Hello Money

57

or Class II software constitute a trade secret. Although Weaver states that Game Systems spent hundreds of thousands of dollars developing the Hello Money software and the Class II software and over $1,000,000 developing other (unspecified) gaming software, the evidence pointed out by Game Systems does not provide support for any of the other six factors, including the extent to which the information in the software was, in fact, a secret.[79] The only evidence that the software is a trade secret is Weaver's statement that the software "constitutes a trade secret of Game Systems," and as this statement is conclusory, it is not competent summary judgment evidence.[80] We hold that the evidence pointed out by Game Systems is not sufficient to raise a fact issue on the challenged elements of the claim. Accordingly, we overrule Game Systems's twelfth issue.

## J. The Parties' Defensive Claims

Game Systems's thirteenth, fourteenth, and fifteenth issues address various defenses asserted by Appellees, and its sixteenth issue addresses its own affirmative defenses. Game Systems argues in its thirteenth issue that the trial court erred by granting summary judgment on Houchin's affirmative defense of the business judgment rule because (1) that rule provides no defense to Game

---

[79]*See In re Bass*, 113 S.W.3d at 739 (listing factors to consider).

[80]*See Ryland Grp., Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996) ("Conclusory affidavits are not enough to raise fact issues."); *Shelton*, 144 S.W.3d at 126 (noting same); *see also Souder*, 235 S.W.3d at 849.

Systems's claim that Houchin breached the duty of loyalty and (2) there is a genuine issue of material fact as to whether Houchin breached that duty. Houchin asserted the business judgment rule as a defense to Game Systems's breach of fiduciary duty and fraud claims against him. Because we have already held that the trial court did not err by granting no-evidence summary judgment for Houchin on these claims, we do not address this issue.[81]

In its fourteenth issue, Game Systems argues that the trial court erred by granting summary judgment on its claims for conversion and tortious interference based on the defense of illegality. Because we have held that the trial court did not err by granting no-evidence summary judgment for Appellees on these claims, we do not address this issue.[82]

In Game Systems's fifteenth issue, it argues that the trial court erred by granting traditional summary judgment for Houchin on his affirmative defenses of ratification and estoppel. Houchin asserted ratification and estoppel as a defense to the claims against him for breach of fiduciary duty, fraud, and tortious interference. Because we have already held that the trial court did not err by granting no-evidence summary judgment for Houchin on these claims, we do not address this issue.[83]

---

[81]*See* Tex. R. App. P. 47.1.

[82]*See id.*

[83]*See id.*

In Game Systems's sixteenth issue, it argues that the trial court erred by granting summary judgment on all of its affirmative defenses because Tronics and Leasing did not move for summary judgment on any of Game Systems's defenses. Game Systems is correct that a trial court may not grant summary judgment on a cause of action not addressed in a motion for summary judgment.[84] But a defendant's mere pleading of an affirmative defense is not sufficient to defeat summary judgment; a defendant relying on an affirmative defense in opposing a summary judgment must come forward with summary judgment evidence sufficient to raise an issue of material fact on each element of the defense.[85] Game Systems does not make any argument that it met its burden on its affirmative defenses. Accordingly, we overrule Game Systems's sixteenth issue.

## K. Attorney's Fees

In Game Systems's seventeenth issue, it argues that the trial court erred by awarding to Tronics and Leasing appellate attorney's fees that were not conditioned upon whether Game Systems's appeal was successful.

The trial court's final judgment includes an award to Leasing of "$15,000.00 for reasonable and necessary attorneys fees in the event of an

---

[84]*Chessher v. Sw. Bell Tel. Co.*, 658 S.W.2d 563, 564 (Tex. 1983); *Shelton*, 144 S.W.3d at 121.

[85]*Bassett v. Am. Nat'l Bank*, 145 S.W.3d 692, 696 (Tex. App.—Fort Worth 2004, no pet.); *see also Ryland Grp.*, 924 S.W.2d at 121; *Gulf, Colo. & Santa Fe Ry. Co. v. McBride*, 159 Tex. 442, 454, 322 S.W.2d 492, 500 (1958).

appeal to the Court of Appeals; and the further sum of $15,000.00 in the event of an appeal to the Texas Supreme Court." The judgment includes the same award to Tronics.

"A trial court may not penalize a party for taking a successful appeal," and, accordingly, "[a]n unconditional award of attorney's fees is improper."[86] Here, the awards were unconditional, and, as Game Systems has prevailed on some of its issues, the trial court's error penalized Game Systems for its appeal.[87] We note that Leasing and Tronics candidly acknowledge in their brief that the awards should have been contingent on a successful appeal. We sustain Game Systems's seventeenth issue and set aside the trial court's grant of appellate attorney's fees.

## L. Admission of Evidence

Game Systems's eighteenth issue is whether the trial court erred by admitting evidence. Game Systems does not have a specific section of its brief under which it addresses this issue. But in its sixth issue, it argues that the trial court erred by admitting Financial's assignment of its claim against Game

---

[86] *Humble Nat'l Bank v. DCV, Inc.*, 933 S.W.2d 224, 236 (Tex. App.—Houston [14th Dist.] 1996, writ denied); *see also Tex. Farmers Ins. Co. v. Cameron*, 24 S.W.3d 386, 400–01 (Tex. App.—Dallas 2000, pet. denied).

[87] *See Arena v. Arena*, 822 S.W.2d 645, 651 (Tex. App.—Fort Worth 1991, no writ); *King Optical v. Automatic Data Processing of Dallas, Inc.*, 542 S.W.2d 213, 218 (Tex. Civ. App.—Waco 1976, writ ref'd n.r.e.) ("[A] trial court may not penalize a party for taking a successful appeal by taxing him with attorneys' fees if he takes it.").

Systems to Leasing.  To the extent that this is the same evidence that Game Systems refers to with respect to its eighteenth issue, we overrule Game Systems's eighteenth issue as moot; to the extent that Game Systems challenged unspecified evidence, we overrule its eighteenth issue as inadequately briefed.[88]

## M.  Motion for New Trial

Game Systems's nineteenth issue asks whether the trial court erred by denying its motion for new trial.  As with its eighteenth issue, Game Systems does not have a specific section of its brief under which it addresses this issue.  We were unable to find elsewhere in Game Systems's brief any argument supported by authority with respect to this issue, and accordingly, we overrule it as inadequately briefed.[89]

## IV.  Conclusion

We affirm in part and reverse in part.  Having sustained Game Systems's sixth and eleventh issues, we reverse the trial court's judgment as to Game Systems's usury claim and Leasing's breach of contract claim and remand this case in part to the trial court for further proceedings on those claims.  Having sustained Game Systems's seventeenth issue, we modify the trial court's judgment to delete the awards of appellate attorney's fees to Tronics and

---

[88]*See* Tex. R. App. P. 38.1(i).

[89]*See id.*

Leasing.  Having overruled Game Systems's remaining issues, we affirm the remainder of the trial court's judgment as modified.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  DAUPHINOT, MCCOY, and MEIER, JJ.

DELIVERED:  May 26, 2011